UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RON GOLAN and DORIT GOLAN, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) Case No. 4:14CV00069 ERW |
| VERITAS ENTERTAINMENT, LLC, et al., | ) ) ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter comes before the Court on "Mission City Management, Inc.'s and Courage 2012 LLC's Motion to Dismiss" [ECF No. 21]; "James R. Leininger's Motion to Dismiss" [ECF No. 32]; and "Michael Dale Huckabee's Motion to Dismiss" [ECF No. 36].

I.     **BACKGROUND**

On October 3, 2012, Plaintiffs James Armbruster, Ron Golan, and Dorit Golan, on behalf of themselves and as representatives of a defined class, filed a putative class action petition in the Twenty-First Judicial Circuit, St. Louis County, Missouri, styled *James Armbruster, Ron Golan and Dorit Golan v. Veritas Entertainment, LLC and Veritas Marketing Group, LLC*, Cause No. 12SL-CC03771 [ECF Nos. 1, 1-5 at 205]. The plaintiffs alleged the named defendants violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq., and 47 C.F.R. § 64.1200(a), by making unsolicited pre-recorded calls to residential telephone lines.

Plaintiffs Ron Golan and Dorit Golan (collectively referred to as "Plaintiffs" or "Golans") filed an Amended Class Action Petition ("Amended Complaint") in the state court on December 4, 2013, styled *Ron Golan and Dorit Golan v. Veritas Entertainment, LLC; Veritas Marketing*

*Group, LLC; Freeeats.com, Inc., d/b/a ccAdvertising; AIC Communications, LLC, d/b/a ccAdvertising; Gabriel S. Joseph, III; Stephen Wayne Griffin; Mission City Management, Inc.; Courage 2012, LLC; James R. Leininger; Sixdi, Inc., d/b/a Sixdi; Bob Brewer; and Michael Dale Huckabee, a/k/a Mike Huckabee* [ECF Nos. 1, 1-3, 4], asserting the named defendants violated Section 227(b)(1)(B) of the TCPA, and Missouri's Do Not Call Law, Missouri Revised Statutes § 407.1095-407.1110. On January 15, 2014, Defendant Mission City Management, Inc. ("Mission City") filed a Notice of Removal to this Court, pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1446 and 1453, alleging this Court has original jurisdiction over claims arising under the TCPA, and under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), and (5), because the putative class contains at least 100 members, at least one member of the putative class is a citizen of a state different from any defendant, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs [ECF No. 1]. The proposed class consists of:

> All persons within the United States to whom Defendants (or some person on Defendants' behalf), within four years of October 3, 2012, initiated one or more telephone calls to such persons' residential telephone lines using the recorded voice of Mike Huckabee to deliver a message as part of the above-mentioned campaign regarding the movie Last Ounce of Courage.

Within the proposed class is the following sub-class:

> All Missouri residential subscribers registered on Missouri's No Call List who received, within any twelve-month period after January 1, 2012, more than one "telephone solicitation" (as defined by Missouri Revised Statutes § 407.1095(3)) by or on behalf of Defendants, using the recorded voice of Mike Huckabee as part of a campaign promoting Last Ounce of Courage.

Defendants Mission City and Courage 2012, LLC ("Courage 2012") jointly filed a Motion to Dismiss on January 31, 2014, alleging Plaintiffs' Amended Complaint failed to state a claim against them, and asking the Court to dismiss, pursuant to Federal Rule of Civil Procedure 12 (b)(6), the claims as to them, with prejudice [ECF No. 21, 22]. On February 14, Defendants

James R. Leininger ("Leininger") and Michael Dale Huckabee ("Huckabee") filed separate motions, also moving the Court to dismiss with prejudice, Plaintiffs' claims against them, for failure to state a claim [ECF Nos. 32, 33, 36, 37]. With leave of Court, Plaintiffs submitted their combined Response to all three Motions to Dismiss on February 28 [ECF No. 42]. Defendants filed a combined Reply in support of their motions on March 14, 2014 [ECF No. 43].

Defendants Veritas Entertainment, LLC; Veritas Marketing Group, LLC; Stephen Wayne Griffin; AIC Communications, LLC; FreeEats.com, Inc.; and Gabriel S. Joseph III have filed Answers to Plaintiffs' Amended Complaint [ECF Nos. 23-25].

On April 1, 2014, Plaintiffs filed a "Motion for Leave to File Second Amended Complaint [ECF Nos. 45 through 45-3] and a "Motion to Certify Class as to Second Amended Complaint and to Stay Further Certification Briefing [ECF Nos. 46, 47].

## II. LEGAL STANDARD

### A. MOTION TO DISMISS

A party may move under Rule 12(b)(6) to dismiss a complaint for "fail[ing] to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). The purpose of a motion to dismiss is to test "the sufficiency of a complaint[.]" *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 876 (8th Cir. 2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Ordinarily, only the facts alleged in the complaint are considered for purposes of a motion to dismiss; however, materials attached to

the complaint may also be considered in construing its sufficiency. *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff[.]" *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). However, if a claim fails to allege one of the elements necessary to recovery on a legal theory, that claim must be dismissed for failure to state a claim upon which relief can be granted. *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011). "Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Although courts must accept all factual allegations as true, they are not bound to take as true "a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotations and citation omitted); *Iqbal*, 556 U.S. at 677-78.

**B.     THE TCPA**

In the TCPA of 1991, Congress found that the use of the telephone to market goods and services to homes was "pervasive due to the increased use of cost-effective telemarketing techniques." Pub. L. No. 102-243, 105 Stat 2394 at § 2 (1991). Additionally, Congress found that unrestricted telemarketing could constitute an intrusive invasion of privacy, and that many consumers were outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers. *Id.* Congress further found that individuals' rights needed to be balanced in way that protected the privacy of individuals and permitted legitimate telemarketing practices. *Id.* Consequently, Congress amended Title II of the Communications Act of 1934 by adding Section 227 at the end of the Act, placing restrictions on the use of telephone equipment. Pub. L. No. 102-243, 105 Stat 2394 at § 3 (1991).

4

In their Amended Complaint, Plaintiffs allege that the named defendants violated 47 U.S.C. § 227(b)(1)(B). Section 227(b)(1)(B) of the TCPA provides that it shall be unlawful for any person "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B)." 47 U.S.C. § 227 (b)(1)(B).

The Federal Communications Commission ("FCC") is the agency granted law-making, law-enforcing, and interpretative authority over the TCPA. *See Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984); 47 U.S.C. §§ 227(b)(2), 227(c)(1), 227(c)(2), 227(g)(3); 22 FCC Rcd. 19896 (Nov. 9, 2007); 20 FCC Rcd. 18272 (Nov. 23, 2005). On May 9, 2013, upon referral of a case by the Sixth Circuit, the FCC issued a Declaratory Ruling on the issue of "on behalf of" liability under section 227(c) of the TCPA. *In the Matter of the Joint Petition filed by Dish Network, LLC, et al.*, 28 F.C.C.R. 6574, 2013 WL 1934349 (F.C.C. May 9, 2013). In this ruling, the FCC also considered vicarious liability of sellers for violations of 47 U.S.C. § 227(b). *Id*. Thus. this Court is able to consider the pending motions with the benefit of the FCC's guidance.

"[A] seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA[.]" *In the Matter of the Joint Petition filed by Dish Network, LLC, et al.*, 28 F.C.C.R. at 6574. Therefore, a seller is not directly liable for a TCPA violation unless it initiates call. *Id.* at 6582. Nor is an action taken for the benefit of a seller by a third-party, without more, sufficient to trigger the liability of a seller under section 227(b). *Id*. at 6593. In addition to the TCPA's provision making it unlawful, absent prior express consent by the call recipient, for a person to initiate telephone calls to residential telephone lines using artificial or

5

prerecorded voices to deliver messages, the FCC's do-not-call rules also make it unlawful for any person or entity to initiate telephone solicitations to residential telephone subscribers who have registered their telephone numbers with the national do-not-call registry. *In the Matter of the Joint Petition filed by Dish Network, LLC, et al.*, 28 F.C.C.R. at 6582-83. The FCC has exempted certain categories of calls from its delivery restrictions on calls using an artificial or prerecorded voice, however, including, among others, calls not made for a commercial purpose, and calls made for a commercial purpose but without an advertisement or telemarketing message. *See* 47 C.F.R. § 64.1200.

Nevertheless, a seller that is not directly liable may be held vicariously liable under federal common law principles of agency for violations of section 227(b) by a third-party telemarketer. *In the Matter of the Joint Petition filed by Dish Network, LLC, et al.*, 28 F.C.C.R. at 6582-83. A formal agency relationship is not required to establish a seller's vicarious liability for the illegal acts of a third-party telemarketer; plaintiffs can also employ principles of ratification and apparent authority in pursuing TCPA claims. *Id*. at 6586-87. Federal common law is in accordance with the Restatement of Agency. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000). Missouri agency law likewise mirrors the Restatement's definition. *See State ex rel. Ford Motor Co. v. Bacon*, 63 S.W.2d 641, 642 (Mo. 2002).

      a.      **Apparent Authority**

"[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Pinkham v. Sara Lee Corp*., 983 F.2d 824, 830 (8th Cir. 1992) (quoting Restatement (Second) of Agency § 27 (1957)); *see also* Restatement (Third) Agency § 2.03

(apparent authority is the power held by agent or other actor to affect principal's legal relations with third parties when third party reasonably believes actor has authority to act on principal's behalf and belief is traceable to principal's manifestations); Restatement (Third) Agency § 1.03 (person manifests assent or intention through written or spoken words or other conduct).

In its Declaratory Ruling, the FCC provided illustrative examples of evidence that could demonstrate a telemarketer is a "seller's authorized representative with apparent authority to make the seller vicariously liable for the telemarketer's section 227(b) violations." *In the Matter of the Joint Petition filed by Dish Network, LLC, et al.*, 28 F.C.C.R. at 6592. The examples included evidence showing: 1) the seller allows the telemarketer access to information and systems that normally would be within the seller's exclusive control; 2) the ability by the telemarketer to enter consumer information into the seller's sales or customer systems; 3) the authority by the telemarketer to use the seller's trade name, trademark, and service mark; and 4) the seller approved, wrote, or reviewed the telemarketing scripts. *Id.* The FCC also opined:

> a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*Id.* The FCC concluded, "At a minimum, evidence of these kinds of relationships . . . should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent."

### b. Ratification

Ratification is "the affirmance by a person of a prior act that did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *BE&K Const. Co. v. N.L.R.B.*, 23 F.3d 1459, 1466 (8th

Cir. 1994) (quoting *Serv. Emp. Union, Local 87 (W. Bay Maint.)*, 291 NLRB 83, 1988 WL 214072 (1988)). Affirmance is either: "(a) a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or (b) conduct by him justifiable only if there were such an election." *BE&K Const.*, 23 F.3d at 1466 (citing section 83 of the Restatement (Second) of Agency). "An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it." *Id.* (quoting § 94 of the Restatement). The Restatement (Third) of Agency defines ratification as "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01(1). "A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." Restatement (Third) of Agency § 4.01(2).

    **C.    MISSOURI'S DO NOT CALL LAW**

These defendants further argue the Amended Complaint's allegations are insufficient as a matter of law to assert Missouri Do-Not-Call claims against them. Missouri's Telemarketing No-Call List statute provides:

> No person or entity shall make or cause to be made any telephone solicitation to any residential subscriber in this state who has given notice to the attorney general, in accordance with rules promulgated pursuant to section 407.1101 of such subscriber's objection to receiving telephone solicitations.

Mo. Rev. Stat. 407.1098.

## III. STATEMENT OF FACTS

For purposes of a Motion to Dismiss, the facts, as alleged in Plaintiffs' Amended Complaint and contained in exhibits incorporated therein, are accepted as true. Those legal conclusions "couched as a factual allegation" in a complaint, however, are not. Defendants correctly assert the Amended Complaint impermissibly lumps defendants together and contains

conclusory statements, such as "Defendants worked in concert to design and implement a telephone advertising campaign . . .." The Court sets forth the following recitation of the pertinent facts, accepted as truly alleged in the Amended Complaint and its incorporated exhibits.

The plaintiffs filing this putative class action on behalf of themselves, and as representatives of the defined class, are the Golans. The Golans are individuals who reside in St. Louis County. Mission City is a Texas corporation, and Courage 2012 is a Texas limited liability company. Leininger is a manager of Mission City. Huckabee is a radio talk show host and a former Arkansas governor.

Since prior to January 16, 2010, the Golans have been the account holders of the residential telephone number (636) 812-XXXX. The Golan's residential telephone number has been registered on the Missouri No Call List since January 16, 2010, and on the federal Do Not Call List since March 7, 2012. The Golans never expressly consented to receiving telephone calls to (636) 812-XXXX from any of the defendants named in the Amended Complaint.

Defendant Stephen Wayne Griffin ("Griffin") is President and Chief Executive Officer of Veritas Marketing ("Veritas Marketing") and Veritas Entertainment, LLC ("Veritas Entertainment"). Veritas Entertainment helped produced "Last Ounce of Courage," a movie that opened nationwide in at least 1,400 theatres on or about September 14, 2012, and played at the Wehrenberg Chesterfield Galaxy 14 theatre in Chesterfield, Missouri. "Last Ounce of Courage" was initially owned by Eastern Gate Films, LLC ("Eastern Gate"), which had started the movie, but Eastern Gate later asked Veritas Entertainment to "come alongside and fix the film." Veritas Entertainment provided capital to fix the film in exchange for an equity interest in "Last Ounce of Courage." After investing money into the film, Griffin and his associated entities owned a

forty-nine percent interest in "Last Ounce of Courage." Mission City made an investment of $10,000,000 to market the movie.

In 2012, Courage 2012 was formed. Thereafter, Courage 2012, Mission City, and Veritas Entertainment owned the film. "Last Ounce of Courage" was the only movie Veritas ever marketed.

In 2012, Leininger introduced Griffin to Gabriel S. Joseph, III ("Joseph"), the sole officer and director of FreeEats.com, Inc., d/b/a ccAdvertising, and the sole member of AIC Communications, LLC, d/b/a ccAdvertising (collectively referred to as "ccAdvertising"). Subsequently, Joseph made a PowerPoint "pitch" to Griffin, concerning how to promote the movie effectively, including the use of telemarketing. Griffin and Joseph then engaged in a series of discussions regarding a telemarketing campaign to promote "Last Ounce of Courage," with Griffin acting on behalf of Veritas Entertainment and Veritas Marketing.

Leininger also introduced Griffin to Huckabee, and, in June or July 2012, Griffin went to Florida to screen "Last Ounce of Courage" to Huckabee at Huckabee's home. Leininger was present at this meeting.

In communicating by email to Griffin, Joseph once carbon-copied Leininger, noting, "[Leininger] can engage as needed." In email exchanges between Griffin and Joseph, Griffin often identified himself as the "President & CEO" of Veritas Entertainment, and used the email address, sgriffin@veritashq.com.

The advertising campaign for "Last Ounce of Courage" included approximately 4 million telephone calls to residential telephone numbers throughout many states in the United States and "Email to Text (ETT) Messages" to 30 million cell phones. Defendants knew the telephone calls would be recorded ahead of time and played when recipients, or their voice mail, picked up the

phone. Joseph referred to telephone calls as "Artificial Intelligence Call[s]" or "AIC" calls. Joseph explained the technology functioned like a "logic tree," in that the telephone call recipient's "yes" or "no" responses to questions would dictate the next prerecorded question.

In an August 31, 2012 email to Griffin, Joseph stated, "We need to start our 'Artificial Intelligence Call' (AIC) calls with or without a Celebrity Voice." Griffin initially was concerned with the cost of a large-scale telephone-call campaign, informing Joseph in an August 31, 2012 email, "The money is just not there," and "the only way I know how to pay for this is to go back to [Leininger]." In this email, Griffin also stated, "I want people to go to see the movie your (sic) right we only have two weeks. Getting a lot of info about people with a call to see the movie does not help me at this point."

ccAdvertising prepared the initial suggested script for the "Last Ounce of Courage" AIC calls. This script included, among others, the following segments:

> 1. Hello[,] this is Governor Mike Huckabee with a 45-second survey. Do you believe in American freedom and liberty?
>
> 2. This survey is about American freedom and liberty. Every weekday, I am on the radio talking about liberty, freedom and values. I invite you to listen to the Mike Huckabee radio show in your area to hear more. Are you, like me[,] concerned that in the last 10 years Americans have lost some of their rights and religious freedom?
>
> 3. Do you agree that traditional American values are under attack in mainstream media and by our government?
>
> 4. Would you[,] like[ ] me[,] Mike Huckabee, like to see Hollywood respect and promote traditional American values?
>
> 5. I am an enthusiastic supporter of a new movie called Last Ounce of Courage. It is a film about faith, freedom, and taking a stand for American values. May I tell you more about why I recommend that you and all Americans see the movie Last Ounce of Courage? (Please note that only "Yes" responses go to segment 6. All other responses go to segment 8.)

6.     Thank you for your interest. Last Ounce of Courage opens in theaters on Friday, September 14th. Last Ounce of Courage will inspire you and your loved ones to celebrate our nation and the sacrifices made to protect our liberties. It is a great story about taking a stand for religious freedom. The film is a timely reminder of all that is worth defending in our nation. Experience the Last Ounce of Courage trailer and see audience reactions at www dot Last Ounce the Movie dot com. That's Last Ounce the Movie dot com. Would you like to hear this information again? (Please note that only "yes" responses go to segment 7. All other responses go to segment 8.)

7.     Last Ounce of Courage opens in theaters on Friday, September 14th. Last Ounce of Courage will inspire you and your loved ones to celebrate our nation and the sacrifices made to protect our liberties. It is a great story about taking a stand for religious freedom. The film is a timely reminder of all that is worth defending in our nation. Experience the Last Ounce of Courage trailer and see audience reactions at www dot Last Ounce the Movie dot com. That's Last Ounce the Movie dot com.

8.     Thank you for your answers so far. I have [just a] few more questions for demographic purposes. Do you own a smart phone?

*   *   *

11.    This is Governor Mike Huckabee. Thank you for your time and views. I invite you to listen to my radio show, every weekday on a station in your area and to see the movie, Last Ounce of Courage[,] in theaters on September 14th. This survey was sponsored by Last Ounce of Courage. For more information[,] please visit Last Ounce the Movie dot com or call 419/777-8263. Goodbye.

*   *   *

14.    This is Governor Mike Huckabee. Thank you for your time and views. I invite you to listen to my radio show, every weekday on a station in your area and to see the movie, Last Ounce of Courage[,] in theaters on September 14th. This survey was sponsored by Last Ounce of Courage. For more information[,] please visit Last Ounce the Movie dot com or call 419/777-8263. Goodbye. (Plays on hang-up if no response is given)

15.    This was a public survey call. We may call back later. (Plays if we get an answering device.)

Joseph emailed this script draft to Griffin, and to defendant Bob Brewer, who is an officer of defendant Texas corporation SixDi, on September 4, 2012, asking them to review the script and provide any comments as soon as possible. Huckabee recorded the script on September 4, 2012,

12

using his own voice.  Huckabee knew the recording would be played for telemarketing purposes during telephone calls to consumers.

After learning, on September 5, 2012, that Huckabee had recorded the script, Griffin sent Joseph an email, stating, "[I] need to review the call."  That same day, Joseph sent Brewer an email, requesting information for targeting cities and states where the most theatres would be showing the movie.  Brewer, using the email address bob.brewer@sixdi.com, responded on September 5, stating, "Let's go.  The Huckabee AIC call is approved."

On September 6, Joseph sent Leininger a test call of the Huckabee call for "Last Ounce of Courage."  Leininger liked the call, but wanted the script to be shorter, progressing from Segment 2 to Segment 5, and skipping the questions in between, because Leininger "was anxious to get people to the movie permission segment."  Joseph made Leininger's suggested changes.

In a September 7, 2012 email to Griffin and Brewer, ccAdvertising provided Griffin and Brewer with a user login and password for a secure information data directory, so that they could access summary reports regarding the Huckabee calls made, including (a) the percentage of homes where the calls reached live respondents or answering devices; (b) client call status, showing how each call was registered by major category; (c) client segment status, showing by percentage levels how each live respondent answered each question; and (d) client response rate, showing composite percentages of how many "Yes" or "No" questions were answered and by how many respondents.  Neither Griffin, nor anyone from Veritas Marketing, ever logged on to ccAdvertising's secure data directory.

Initially, ccAdvertising invoiced SixDi for its work on the "Last Ounce of Courage" campaign.  Later, ccAdvertising's invoices, including Invoice #4065, were sent to Griffin's attention, and listed "Veritas Entertainment" in the bill-to section.  Veritas Entertainment or

13

Veritas Marketing paid ccAdvertising $248,500 for the 4 million AIC calls to residential telephone numbers, and $30,000 for the 30 million ETT messages to cell phones. ccAdvertising received by wire transfer, $100,000 on or about September 7, 2012; $100,000 on September 14, 2012; and the final $78,500 during the first week of October 2012.

In a September 14, 2012 email to Griffin concerning payments, Joseph requested a reply indicating when he could expect the next $100,000 payment on the balance due. He threatened to shut down the Huckabee AIC campaign if he did not hear from Griffin that morning, and stated, "[P]lease let me know if I need to engage [Leininger] in this to make sure he has provided you the monies you need to pay ccAdvertising."

On September 10 and 12, 2012, ccAdvertising, via telephone number 202-769-1087, initiated telephone calls to the Golans' residential telephone line, using Huckabee's pre-recorded voice to deliver a message encouraging the Golans to go see "Last Ounce of Courage." The Golans received two of the Huckabee calls, which left messages consisting of language from Segment 15 of the script on their answering machine: "This was a public survey call. We may call back later." The name showing on the Golan's caller ID, corresponding to 202-769-1087, was "2012FREERSRCH."

When "lastouncethe movie.com" was typed as a Uniform Resource Locator ("URL"), the URL redirected the user to http://www.standusa.com/last-ounce-of-courage/, which contained a "BUY TICKETS" link, as well as an "ABOUT VERITAS" link, http://www.standusa.com/looc-about-veritas/.

After the Huckabee calls were made to 4 million homes, ccAdvertising created a "Survey Questionnaire," which identified the purpose for the "survey" was "to identify those respondents who believe in American freedom and liberty and who are interested in hearing more information

14

about the movie "Last Ounce of Courage." According to this Survey Questionnaire, "1,018,609 live responses were detected." Regardless of whether recipients of the calls answered "yes" or "no" to Questions 1 and 2 in the script, recipients who did not hang up were presented with Question 5, in which Huckabee recommended they see "Last Ounce of Courage."

Joseph and ccAdvertising obtained the telephone numbers called during the campaign from a database purchased from Axion Corporation more than a decade earlier. This database provided White Pages data in digital format. Other than named defendants, none of the persons who were called had indicated to any defendant, or anyone else, a desire to receive telephone calls promoting "Last Ounce of Courage."

## IV. DISCUSSION

Plaintiffs allege the named defendants violated section 227(b)(a) (B) of the TCPA, which, with certain exceptions, prohibits persons from initiating calls to residential telephone lines using a prerecorded voice to deliver a message without the called party's prior express consent. Plaintiffs also claim the moving defendants are liable under Missouri's Do Not Call law, because they made, or caused to be made, the telephone solicitation to Plaintiffs' residential lines, in that the defendants all worked to "bring about" the prerecorded voice calls.

In their Motion to Dismiss pursuant to Rule 12(b)(6), the moving defendants claim Plaintiffs fail to allege facts to support their claims that these defendants violated the TCPA and Missouri's Telemarketing No-Call List Act. The moving defendants contend Plaintiffs have failed to allege facts sufficient to show they made or "cause[d] to be made any telephone solicitation to any residential subscriber in this state[,]" as required by the Missouri statute. Mission City and Courage 2012 further contend the specific allegations regarding them, together

with Plaintiffs' conclusory, general allegations concerning all the defendants, are insufficient as a matter of law to assert TCPA claims against Mission City and Courage 2012.

As to Plaintiffs' TCPA claim, the moving defendants contend Plaintiffs fail to allege sufficient facts showing they either initiated the calls, or are vicariously liable for ccAdvertising's calls [ECF No. 22]. The moving defendants argue Plaintiffs' theories of ratification, and impermissible delegation of duty fail, claiming Plaintiffs did not raise them in their Complaint, and the Complaint's allegations do not support either theory. As well, the moving defendants contend Plaintiffs fail to allege sufficiently their other theories of liability, including allegations supporting the existence of a formal agency relationship.

They contend the Amended Complaint fails to plead sufficient facts to support Plaintiffs' apparent authority agency and ratification theories, and they more specifically argue the Complaint fails to plead sufficiently that they controlled the manner and means of the calls [ECF No. 43]. As to Plaintiffs' claims against Courage 2012, the defendants assert Plaintiffs, at most, have alleged the entity owned the film, and they contend ownership does not make an owner liable, even assuming the owner financed the operations. The moving defendants contend Plaintiffs' claims against Mission City fail for the same reason, and they argue the TCPA does not impose liability upon one who merely invests in a product.

In their combined response in opposition to the Motions to Dismiss filed by Mission City, Courage 2012, Leininger, and Huckabee, Plaintiffs claim the moving defendants "were intimately involved in the creation of the message and the timing of the calls" [ECF No. 42 at 2]. Plaintiffs contend "common sense," and the Restatement (Third) of Agency, prevent parties from avoiding liability for torts they orchestrate, but hire a third party to execute. Plaintiffs assert the moving defendants controlled the process and terms by which the violations occurred, and argue

defendants' actions developed a principal-agent relationship with ccAdvertising that subjected them to vicarious liability for the violations. Specifically, as to Mission City and Courage 2012, Plaintiffs contend in their opposition that these two entities, through their principal, Leininger, funded the calls, acquired Huckabee as the "celebrity voice" for the prerecorded calls, and hired ccAdvertising as the marketer of the calls. Plaintiffs contend Courage 2012, as owner of the film, is chargeable with its officers' knowledge and participation in causing the calls to be made on its behalf. They claim Mission City, through its principal, Leininger, invested at least $10,000,000 to market "Last Ounce of Courage"; was informed of, and actively participated in the marketing plan for the film; and reviewed and edited the final prerecorded voice scripts to be used in the calls. Plaintiffs further argue that, even if Mission City and Courage 2012 did not give actual authority to ccAdvertising to make the calls, the two entities and the other moving defendants "ratified the wrongful acts by accepting the benefit of the wrongful advertising, without protest." Plaintiffs claim Mission City's and Courage 2012's acceptance of proceeds from the movie, without objecting to the calls having been made, constituted ratification of the calls that were physically initiated by ccAdvertising, making them as liable as if ccAdvertising had made the calls as their agent acting with actual authority.

Keeping in mind the standard for consideration of dismissal motions, the Court's review reveals issues of considerable concern that warrant holding any ruling in abeyance, pending additional briefing by the parties. Plaintiffs' recently filed motions for leave to file a second amended complaint and to certify the class as to the proposed amended complaint, make the need to address these threshold issues even more compelling.

The most pressing concerns presented by the factual allegations raise the questions of whether Plaintiffs suffered any injury sufficient to give them standing to bring this case in federal

17

court, and whether they are proper class representatives for this action. Article III case-or-controversy standing is a question that must bear the Court's *sua sponte* scrutiny. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). Plaintiffs allege these defendants and others violated the Missouri Do Not Call Law, and Section 227(b)(1)(B) of the TCPA, a provision that makes it unlawful for a person "to initiate" a call to a residential line using an artificial or prerecorded voice to deliver an unauthorized message, unless the call is initiated for any emergency purpose, or is exempted by the FCC. 47 U.S.C. § 227(b)(1)(B); Mo. Rev. Stat. §§ 407.1095-407.1110.

The applicable FCC regulation exempts calls not made for a commercial purpose, and calls made for a commercial purpose but without an advertisement or telemarketing message, from the TCPA's prohibition on calls using an artificial or prerecorded voice. *See* 47 U.S.C. § 227(b)(1)(B) and (b)(2)(B); 47 C.F.R. § 64.1200. The Amended Complaint's allegations show the moving defendants did not "initiate" the calls made to the Golans. The Amended Complaint further reveals the two calls placed to the Golans' telephone number reached only their answering device, and the entirety of the message left on the device stated: "This was a public survey call. We may call back later." Plaintiffs' allegations show that the Golans had no knowledge of the contents of the message they now challenge individually and "on behalf of all others similarly situated." Although the TCPA, in its effort to protect consumers' privacy rights, provides that a person who initiates calls with a prerecorded message may be liable, the statute does not show Congress expressed an intent to circumvent the Article III case-or-controversy standing requirement, which requires a plaintiff to demonstrate a distinct and palpable injury when seeking a private remedy. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975). Presumably, a plaintiff seeking redress must hear a message to ascertain whether it is made for a commercial purpose and contains an unsolicited advertisement. It is difficult to discern how the Golans'

privacy rights were invaded by a message they did not hear, and of which they had no knowledge. The Golans' standing to bring a claim under Missouri's Do Not Call Law, and ability to act as class representatives under Missouri law, are likewise in issue, as the restrictions of Section 407.1107.3(1)-(3) apply to "telephone solicitations," which, again, would require some knowledge of a call's message.

As an initial matter, the Court notes Plaintiffs' failure to raise ratification and delegation of duty in their Complaint is not an absolute bar to a possible recovery under those theories. In some circumstances, a party may obtain relief on a theory of recovery proved during trial, but not expressly raised in the Complaint, provided that the theory is based on the same wrongful act pleaded, and the opposing party has been afforded fair notice. *See Morgan Distrib. Co., Inc. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989). For purposes of a motion to dismiss, however, the Court's inquiry is whether Plaintiffs' Complaint, liberally construed, alleges all of the elements necessary to recover on a legal theory. *Huggins*, 592 F.3d at 862; *Crest Constr. II, Inc.*, 660 F.3d at 355.

Plaintiffs, relying on the FCC's declaratory ruling in *In the Matter of the Joint Petition filed by Dish Network*, which analyzed the vicarious liability of sellers for violations of 47 U.S.C. § 227(b), contend the moving defendants are vicariously liable for the actions of a third-party telemarketer. 47 C.F.R. 64.1200(f)(9) defines "seller" as "the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to another person." The Amended Complaint's factual allegations and incorporated exhibits do not appear to support the proposition that any moving defendant qualifies as a "seller." The Court will order the parties to

brief the issues discussed above, particularly, the jurisdictional issue of standing, and the named plaintiffs' qualifications to act as class representatives.

Accordingly,

**IT IS HEREBY ORDERED** that "Mission City Management, Inc.'s and Courage 2012 LLC's Motion to Dismiss" [ECF No. 21]; "James R. Leininger's Motion to Dismiss" [ECF No. 32]; and "Michael Dale Huckabee's Motion to Dismiss" [ECF No. 36] are **HELD in ABEYANCE**, **pending additional briefing by the parties.**

**IT IS FURTHER ORDERED** that the parties shall brief the issues discussed above. Plaintiffs shall submit their brief addressing the issues within twenty (20) days of the entry of this Order. Defendants shall file their response to Plaintiff's briefs within ten (10) days of Plaintiffs' filing of their brief.

Dated this   4th   day of April, 2014.

                                                          _____
                                                          E. RICHARD WEBBER
                                                          SENIOR UNITED STATES DISTRICT JUDGE