```
 1                    UNITED STATES OF AMERICA
                    EASTERN DISTRICT OF MISSOURI
 2                        EASTERN DIVISION

 3    RON GOLAN and DORIT GOLAN,        )
      et al.,                          )
 4                                     )
                Plaintiffs,            )
 5                                     )
          vs.                          )   No. 4:14-CV-0069 ERW
 6                                     )
      VERITAS ENTERTAINMENT, LLC,      )
 7    et al.,                          )
                                       )
 8              Defendants.            )

 9

                      TRANSCRIPT OF JURY TRIAL
10
              BEFORE THE HONORABLE E. RICHARD WEBBER
11                 UNITED STATES DISTRICT JUDGE

12                        Volume 1-A
                          August 7, 2017
13

14    APPEARANCES:

15    For Plaintiffs:      Mr. John G. Simon
                           Mr. Kevin M. Carnie
16                         SIMON LAW FIRM, PC
                           800 Market Street
17                         Suite 1700
                           St. Louis, MO  63101
18
                           Mr. Brian A. Abramson
19                         WILLIAMS AND KHERKHER
                           8441 Gulf Freeway
20                         Suite 600
                           Houston, TX  77017
21
                           Mr. Robert Schultz
22                         Mr. Ronald J. Eisenberg
                           SCHULTZ AND ASSOCIATES, LLP
23                         640 Cepi Drive
                           Suite A
24                         Chesterfield, MO  63005

25
```

```
1   For Defendant          Mr. Fredrick J. Ludwig
    Veritas Marketing       LUDWIG LAW FIRM, LLC
2   Group and Stephen       9666 Olive Boulevard
    Griffin:                Suite 690
3                           St. Louis, MO  63132

4
    For Defendant          Mr. Ari Rothman
5   Dr. James L.           Mr. Brian L. Schwalb
    Leininger:             Mr. Justin Blake Nemeroff
6                          Ms. Danielle E. Sunberg
                           VENABLE, LLP
7                          600 Massachusetts Avenue, NW
                           Washington, DC  20001
8
                           Mr. John W. Moticka
9                          STINSON AND LEONARD, LLP
                           7700 Forsyth Boulevard
10                         Suite 1100
                           St. Louis, MO  63105
11

12  For Defendant          Ms. Teresa M. Young
    Gabriel Joseph:        BROWN AND JAMES, PC
13                         800 Market Street
                           Suite 1100
14                         St. Louis, MO  63101

15
    For Defendant          Mr. Eric David Block
16  Courage 2012, LLC:     Mr. Patrick T. McLaughlin
                           SPENCER FANE, LLP
17                         1 North Brentwood Boulevard
                           Suite 1000
18                         St. Louis, MO  63105

19

20

21  REPORTED BY:           SUSAN R. MORAN, RMR, FCRR
                           Official Court Reporter
22                         111 South 10th Street
                           St. Louis, MO  63102
23                         (314) 244-7983

24
    Proceedings recorded by mechanical stenography, produced by
25  computer-aided transcription.
```

I N D E X

VOIR DIRE

By The Court...............................7

By Mr. Simon.............................54

By Mr. Ludwig............................65

By Ms. Young.............................66

By Mr. McLaughlin........................81

By Mr. Schwalb...........................84

1          (The following proceedings were held in open court

2     on August 7, 2017 at 8:30 a.m.:)

3          THE COURT:  I'm calling the case Ron Golan and

4     others versus Veritas Entertainment, LLC and others, the

5     number is 4:14-CV-0069 ERW.  Are plaintiffs ready?

6          MR. SIMON:  Yes, Your Honor.

7          THE COURT:  Are defendants ready?

8          MR. SCHWALB:  Yes, Your Honor.

9          MR. LUDWIG:  Yes, Your Honor.

10          MR. McLAUGHLIN:  Yes, Your Honor.

11          THE COURT:  Okay.  Anything that you care to raise

12     pretrial at this time, I'll be happy to hear it before the

13     jury arrives.  Just so you can use your time most

14     advantageously, the jury likely will not be here until about

15     9:15, they go through an orientation program, so feel free to

16     move around.  I tend to be a little less informal, I like to

17     come and go without you being expected to stand and do those

18     kind of things.  While this trial is going on you have lots

19     of matters to attend, and feel free to come and go as you

20     choose.

21          Anything to raise at this time?

22          MR. SIMON:  None for the plaintiffs, Your Honor.

23          MR. SCHWALB:  Thank you, Your Honor.

24          THE COURT:  All right.  Thank you.

25          I've been notified that one of the jurors this

1   morning is in shorts, and that doesn't offend my

2   sensibilities, so just be prepared for that.

3            (Court in recess from 8:33 a.m. until 8:43 a.m.)

4            THE COURT:  There is one issue that perhaps we

5   should discuss openly and frankly.  You will not be receiving

6   any information about the jurors until they come into the

7   courtroom.  Each side will be given packets of juror

8   information.  The rule is strict, there is to be no

9   investigation of jurors on social media or in any other

10  fashion until the conclusion of the case.  We need to talk

11  about what or to what extent it will be -- the parties will

12  exercise their rights to check social media and other sources

13  for the purpose of post-trial motions.  But is there a firm

14  understanding by everyone that no investigation of jurors

15  through social media or any other means is permitted until

16  after the trial?  Does anyone object to that process?  Okay.

17           And then what happens after the trial in my view is

18  it's your business to do whatever you believe you should do

19  to protect your interest in that regard.  But I'm more

20  concerned about what happens until the jury is discharged.

21  All right.

22           And I'm going to make a statement.  When you talk

23  about the use of phones, that after the trial their social

24  media is subject to being checked so they need to be very

25  careful in making statements during voir dire that -- so that

1  they do not say anything that would later prove to be

2  inconsistent if their social media is checked.  Is there any

3  objection to that?

4          MR. SIMON:  No, Your Honor.

5          MR. SCHWALB:  No, Your Honor.

6          THE COURT:  All right.  Thank you.

7          (Court in recess from 8:45 a.m. until 8:50 a.m.)

8          THE COURT:  Another thought I had, when the jurors

9  are brought in they will all be seated in the back and then

10 they will be called up one by one.  I'm going to take a few

11 minutes for you to go over the juror list before we seat

12 them.  So I'll tell them just to remain there for a few

13 minutes and you'll have a chance to look at the list before

14 they are called.

15         MR. SCHWALB:  Can we have multiple copies so all our

16 clients and counsel can look?

17         THE COURT:  You'll have multiple copies.  How many

18 can you provide?

19         THE CLERK:  I thought it's only each attorney gets

20 one.  Each attorney gets the list, not the parties.

21         MR. SCHWALB:  Okay.

22         (Court in recess from 8:51 a.m. until 9:24 a.m.)

23         THE COURT:  You may be seated.  Good morning, ladies

24 and gentlemen.  Thank you so much for your prompt appearance

25 this morning.  Welcome to your United States District Court.

1    This is the first time the attorneys have had an opportunity

2    to receive any information about you.  And that information

3    for your comfort is the county in which you live, whether you

4    own or rent your residence, the level of your education, your

5    occupation, and the name of your employer and the number of

6    your children -- no names are associated with those children.

7              So there are -- they will have this opportunity to

8    quickly review this information.  And then when that happens

9    you will be called up to take a seat in the jury box, and

10   then the remainder that will not fit in the box will be

11   seated along the front row of the well as we go.  So just

12   relax for a few minutes, please.

13             We'll take about five more minutes.

14             As your name is called, please come forward.

15             (Jury panel seated.)

16             THE COURT:  Calling the following case for trial,

17   Ron Golan and others versus Veritas Entertainment, LLC and

18   others.  Are plaintiffs ready?

19             MR. SIMON:  Yes, Your Honor.

20             THE COURT:  Are defendants ready?

21             MR. LUDWIG:  Yes, Your Honor.

22             MS. YOUNG:  Yes, Your Honor.

23             MR. McLAUGHLIN:  Yes, Your Honor.

24             MR. SCHWALB:  Yes, Your Honor.

25             THE COURT:  There will be two occasions for you --

1    first of all for this group to take an oath and then later

2    the members selected to try the case will take an oath.  At

3    this time please rise and raise your right hand.  This oath

4    will require you to well and truly answer all questions

5    propounded of you as prospective jurors.  If for any reason

6    you're unable to take the oath then remain standing after all

7    the other jurors are seated.  Go ahead.

8              (Jury panel sworn.)

9              THE COURT:  Voir dire means to speak the truth.  So

10   you're going to be asked questions first by me and then by

11   counsel.  I want to introduce members of the court team.

12   This is Sue, the court reporter.  This is Melissa, the law

13   clerk.  Melanie, the team clerk.  And Nick is hiding out over

14   there somewhere in the corner, he's in charge of security.

15             It is now my opportunity to ask some questions.

16   Each time you give a response even though you may answer

17   several times, please first state your juror number for the

18   benefit of the court reporter.  If for any reason giving an

19   answer might be the source for whatever reason of

20   embarrassment to you or you want to answer the question

21   privately at the bench, I'm going now to explain how that

22   process works.

23             As you can tell this microphone is activated, okay.

24   This microphone no longer is activated.  This microphone is

25   activated.  Counsel will come up here, you as a juror may

1    come up here and give your answer privately at the bench.

2    And I get to roll back and forth and get a little exercise

3    each time.  Feel free to exercise that right whenever you

4    feel compelled to do so.

5          All of you are qualified jurors.  In some cases

6    because of lifetime experiences other jurors are in a better

7    position to be selected for the trial of this case.  I have

8    some preliminary qualification questions.  Is there anyone

9    who is not a citizen of the United States?

10          Is there anyone who is not at least 18 years of age?

11          Is there anyone who cannot read, write, speak, and

12   understand the English language?

13          Do any of you believe you currently suffer from any

14   mental or physical disability which would impair your ability

15   to sit as a juror in this case?

16          I want to talk a little bit about the length of time

17   because that might influence some of your other questions.

18   There is an expectation that this case may be finished at the

19   end of this week.  It's very likely it will not be finished

20   before the end of the week, and there's a possibility it

21   might extend into next week.  So in answering your questions

22   please keep in mind the time duration expected for your

23   attendance.

24          Would counsel bring up a list on each side of

25   witnesses at this time for me to read.  I'm going to read a

1    list of prospective witnesses.  The reason for doing that now

2    is if any of you know or think you may know any of these

3    witnesses then please raise your hand because the extent of

4    your knowledge may influence whether you should be a juror in

5    this case.

6          Let me read the list now.  Ron Golan, G-o-l-a-n;

7    Gabriel S. Joseph; Dorit, D-o-r-i-t, Golan; Stephen Griffin;

8    James Leininger, MD; Governor Michael D. Huckabee; Tim Lyles;

9    Todd Thetford, T-h-e-t-f-o-r-d; Dorit Golan.  And I believe

10   that's the extent of the witnesses.  Is that correct?

11         MR. SIMON:  Yes, Your Honor.

12         THE COURT:  Very well.  I see no positive responses.

13   After reflection is there anyone who thinks they may know,

14   personally know any of those witnesses?  Thank you.

15         I would like at this time for respective counsel to

16   introduce those individuals at their table, please.  First

17   for plaintiff.

18         MR. SIMON:  Yes, Your Honor, I'm John Simon with the

19   Simon Law Firm.  This is Kevin Carnie with the Simon Law Firm

20   and this is Brian Abramson.

21         THE COURT:  Is there anyone on the panel who knows

22   or believes you may know any of the individuals just

23   introduced to you?  All right.  Thank you.  For defendants?

24         MR. LUDWIG:  My name is Fredrick Ludwig, of the

25   Ludwig Law Firm.

1          THE COURT:  Were you able to hear that last name?

2     Okay.  All right.

3          MS. YOUNG:  Hello everyone.  I'm Teresa Young, and

4     I'm with the law firm of Brown & James.  And, I'm sorry, this

5     is also Gabe Joseph, he's a party.

6          THE COURT:  All right.

7          MR. SCHWALB:  Good morning everybody, my name is

8     Brian Schwalb.  I'm with the law firm of Venable.  With me is

9     my partner Ari Rothman and our colleagues Justin Nemeroff,

10    Daniel Sunberg, and Jana Gibson, and our counsel here in St.

11    Louis, John Moticka.  And our client is Dr. Jim Leininger.

12         THE COURT:  Is there anyone -- okay.  Go ahead.

13         MR. McLAUGHLIN:  Good morning, everyone, I'm Pat

14    McLaughlin.  I'm with the law firm Spencer Fane here in St.

15    Louis.  This is my colleague Eric Block.  Our paralegal,

16    Melanie Cummins.  And here representing our client Courage

17    2012 is Tim Lyles and Todd Tethford.

18         THE COURT:  Is there anyone on the panel who knows

19    or believe they possibly may know any of the individuals

20    introduced to you as counsel or as parties?  I see no hands.

21         Have any of you read any material about this case,

22    listened to any account of the case on television, radio,

23    computer monitor or other electronic media?

24         Have you talked to anyone about the case?

25         Have you received any information of any source

1    about the case?

2            I'm going to go over these again but that gives you

3    a general preview.  So let's talk about them again.

4            Has anyone listened to any account of the case on

5    television?  I see no hands.

6            Have you listened to any account on the radio,

7    through a computer monitor or any other electronic media?  I

8    see no hands.

9            Have you talked to anyone about the case?  I see no

10   hands.

11           Have you received any information from any source

12   about the case?  In that regard, it's very important that

13   this case be decided just on the basis of what you see and

14   hear in court and as you're instructed on the law.  That's

15   the reason for asking these questions.  From what I've heard

16   so far I have no reason to believe that anyone on this panel

17   knows anything about this case before coming in here today.

18   If that's not correct, please raise your hand.  We have a

19   hand okay.  Yes.

20           VENIREPERSON NO. 29:  Can you state the case again,

21   please?

22           THE COURT:  Yes, sure.  The case is Ron Golan versus

23   Veritas Entertainment and others.  I want to read a list of

24   all of the parties for that reason.  See if I have a list.

25           When I say Ron Golan and others, it's et al. and

1   others, but here is a complete list of the parties.  Ron

2   Golan and Dorit, D-o-r-i-t, Golan.  Dr. Leininger, Enthuse

3   Entertainment, Courage 2012, Veritas Entertainment, LLC,

4   Eastern Gate, Stephen Wayne Griffin, Joseph -- Gabriel S.

5   Joseph, ccAdvertising, FreeEats.com, AIC Communications, Bob

6   Brewer, SixDi, Inc.  That's a complete list of all the

7   parties.  Do any of those names sound familiar to you?  Does

8   that answer your question?

9            VENIREPERSON NO. 29:  Thank you.

10           THE COURT:  Okay.  Thank you for asking.

11           I'm going to be asking the questions in an awkward

12  way perhaps.  Is there anyone who does not understand if I

13  ask it in a positive way, a hand might come up and I might

14  miss anyone.  Is there anyone who does not understand that it

15  is a duty of a juror to listen to the evidence as it comes

16  from the witness stand and decide the case only from the

17  evidence seen and heard in court and under the instructions

18  of the Court and to set aside anything else you may have seen

19  or heard or viewed?  Is there anyone who does not understand?

20  Okay.  Is there anyone who cannot do that?

21           Has anyone formed -- well, let me -- I think the

22  answer is no but let me ask it.  Has anyone formed an opinion

23  about the merits of the case before coming to court or since

24  you arrived at court today?

25           I want to explore a little bit about any hardship.

1   The first question had to do with whether you suffer from any

2   physical or mental disability which would limit or restrict

3   your ability to sit here for the duration of this case.  I

4   want to ask this in a different way.  I know that each one of

5   you who appears here today is surrendering valuable time to

6   employment, family members and others, so the question really

7   isn't whether this is an inconvenience, I already know the

8   answer to that question.  The question is is there anything

9   so pressing upon you in your life, the care of an individual

10  for whom you have the sole responsibility, prepaid airline

11  flights to some exotic place that if you do not use those

12  tickets you will forfeit money, anything of that nature,

13  that's what I'm looking for.

14          On the back row.  And, again, this case you have to

15  be prepared for the likelihood it may go into the second

16  week.  And I'm looking at Juror No. 16.

17          VENIREPERSON NO. 16:  Yes, I have -- I'm pregnant

18  and I have a doctor's appointment that I have to be at on

19  Wednesday.

20          THE COURT:  On Wednesday, all right.  Just a moment.

21  Let me get the right piece of paper here.  And your number

22  again is?

23          VENIREPERSON NO. 16:  Sixteen.

24          THE COURT:  And another hand, yes, 15.

25          VENIREPERSON 15:  15.  My daughter, depending on the

1    length of this, I'm moving her into college.  It's a

2    five-hour drive at the end of next week.

3            THE COURT:  Okay.  I can give you assurance that it

4    will not go all the way until a week from Friday.

5            VENIREPERSON NO. 15:  Okay.

6            THE COURT:  All right.

7            VENIREPERSON NO. 15:  Okay.  Then I'm okay.

8            THE COURT:  You can hold me to it.  Yes, your

9    number?

10           VENIREPERSON NO. 29:  No. 29.  My daughter-in-law

11   and grandson were in a car accident last Thursday, they live

12   out of state.  My grandson has suffered an orbital eye

13   fracture.  I don't know if anything else is going to happen,

14   but I would have already been down here had I not had this

15   summons, so he may or may not need me.  I just need to let

16   you know that that's imposing on me.

17           THE COURT:  And I will excuse you in a heartbeat for

18   something of that nature.  What I hear you say is at this

19   time you're not sure if your presence somewhere else would be

20   required.  Is that true?

21           VENIREPERSON NO. 29:  That's correct.

22           THE COURT:  Okay.  Now, if you have any feeling

23   about the likelihood that might change in the next few days?

24           VENIREPERSON NO. 29:  I'm praying it doesn't.  But

25   he's seven and a half years old, so I'm hoping he does good.

1          THE COURT:  Let me ask you this:  If you're selected

2     to be on this jury and health deteriorates, that's where your

3     intention is going to be, and rightfully so, correct?  That's

4     a potential issue.  We'll take it up as a potential issue,

5     okay.  Thank you.

6          VENIREPERSON NO. 29:  Thank you.

7          THE COURT:  Anyone else?  Yes, and that would be No.

8     14.

9          THE DEFENDANT:  Fourteen.

10         THE COURT:  Okay.  Go ahead.

11         VENIREPERSON NO. 14:  I work at a university and

12    today is orientation, and I'm the only person who would be

13    able to do it and there is no backup.  So this overlap

14    negatively impacts what I'm supposed to be doing.  And there

15    really isn't anyone else who can cover me.

16         THE COURT:  Thank you.  Did I see any other hands?

17    Okay.  Thank you.

18         The next question has to do with your prior jury

19    service.  What I'll be asking is if you've ever been involved

20    as a juror in a civil case or a criminal case, whether it's

21    in federal court or state court, and whether a verdict was

22    reached.  Don't tell me how -- what the verdict was, just

23    whether a verdict was reached.  So we'll ask those in the

24    jury box first.  Has any panel member ever served as a juror

25    in either a civil or criminal case?  That may be a record.

1    Here is one, okay.

2           VENIREPERSON NO. 6:  For federal or --

3           THE COURT:  Your number?

4           VENIREPERSON NO. 6:  Six.  Oh, yes.

5           THE COURT:  Go ahead.  Federal or state?

6           VENIREPERSON NO. 6:  Yes, it was like a domestic

7    violence case.

8           THE COURT:  Okay.  And how long ago was that?

9           VENIREPERSON NO. 6:  Two or three years ago.

10          THE COURT:  Okay.  Is there anything about what

11   happened in that case that would make it difficult or

12   impossible for you to sit as a fair and impartial juror in

13   this case?

14          VENIREPERSON NO. 6:  I don't think so.

15          THE COURT:  Okay.  Was a verdict reached in that

16   case?

17          VENIREPERSON NO. 6:  Yes.

18          THE COURT:  Okay.  Thank you.  Okay.  In the center

19   section, anyone on prior jury service?  Yes, No. 19.

20          VENIREPERSON NO. 18:  No. 18.

21          THE COURT:  Okay.

22          VENIREPERSON NO. 18:  I served for the state.

23          THE COURT:  I'm sorry, I can't hear you.

24          VENIREPERSON NO. 18:  I have served both in a civil

25   and criminal case at the state level.  The civil case was

1    decided outside of the jury and the criminal case did reach a

2    verdict with the jury.

3            THE COURT:  All right.  Is there anything about that

4    jury service on either case or both cases that would cause

5    you to be unable to reach a fair and impartial verdict in

6    this case?

7            VENIREPERSON NO. 18:  No, sir.

8            THE COURT:  All right.  Thank you.  And yes, your

9    number, please?  Okay.  We have three.  What's your number,

10   please?  Yes, sir.

11           VENIREPERSON NO. 25:  Twenty-five.

12           THE COURT:  What's the number?

13           VENIREPERSON NO. 25:  Twenty-five.

14           THE COURT:  Go ahead.

15           VENIREPERSON NO. 25:  I served in a state criminal

16   case about four years ago.

17           THE COURT:  And you said in the state case and what?

18           VENIREPERSON NO. 25:  About four years ago, and a

19   verdict was reached.

20           THE COURT:  All right.  Anything about that, sir,

21   that would make it difficult or impossible to be fair in this

22   case?

23           VENIREPERSON NO. 25:  No.

24           THE COURT:  All right.  26.

25           VENIREPERSON NO. 26:  I served in a state case,

1    criminal case.  A verdict was reached.

2            THE COURT:  Anything about that that would make it

3    difficult or impossible for you to be fair in this case?

4            VENIREPERSON NO. 26:  No.

5            THE COURT:  Yes, sir.

6            VENIREPERSON NO. 27:  Twenty-seven, state civil

7    case, over ten years ago, a verdict was reached.

8            THE COURT:  You almost answered all my questions.

9    Anything about that that would make it difficult --

10           VENIREPERSON NO. 27:  No.

11           THE COURT:  Thank you, sir.  Anyone else?

12           VENIREPERSON NO. 28:  I'm No. 28.  I have served on

13   two civil cases and verdicts were reached in both of those.

14           THE COURT:  Were those state cases or federal?

15           VENIREPERSON NO. 28:  Yes, state.

16           THE COURT:  Anything about that that would make it

17   difficult or impossible for you to be fair in this case?

18           VENIREPERSON NO. 28:  No.

19           THE COURT:  Thank you.  Anyone else I missed?

20           Have any of you, your spouse, your child, your

21   mother, father, brother, or sister ever been a party to a

22   lawsuit as plaintiff, as defendant, or in any other capacity

23   as a party?  Now before I see hands, I'm not asking if any of

24   you ever testified at trial or took a deposition or anything

25   like that, it's only if you were a party, if you brought a

1    suit as a party or you were sued as a party.

2         Now, it's very important to think carefully about

3    this question, because if you were and you think you're not

4    sure if you should answer, please answer because if it's

5    later determined that you were, in fact, a party, that could

6    be the cause to have this case retried.  So let me ask again,

7    have any of you, your spouse, your mother, brother, father,

8    sister ever been a party to a lawsuit as plaintiff, as

9    defendant or in any other capacity as a party?  We'll start

10   in the center section?  Number, please.

11        VENIREPERSON NO. 22:  Twenty-two.

12        THE COURT:  Go ahead.

13        VENIREPERSON NO. 22:  Defendant in a landlord tenant

14   case.

15        THE COURT:  About how long ago was that?

16        VENIREPERSON NO. 22:  Maybe a year to two years ago.

17        THE COURT:  Okay.  Is there anything about that

18   experience that would make it difficult or impossible for you

19   to be fair and impartial in this case?

20        VENIREPERSON NO. 22:  No, I don't think so.

21        THE COURT:  Okay.  All right.  Now, in the back over

22   on my right side, in the back, yes, No. 29.

23        VENIREPERSON NO. 29:  No. 29.  My father was.

24        THE COURT:  I'm sorry?

25        VENIREPERSON NO. 29:  My father.

1          THE COURT:  Okay.  A lawsuit?  Did he bring the suit

2    or was he sued?

3          VENIREPERSON NO. 29:  He would have brought the suit

4    I guess.

5          THE COURT:  He what?

6          VENIREPERSON NO. 29:  He would have been a plaintiff

7    in a suit.

8          THE COURT:  Okay.

9          VENIREPERSON NO. 29:  As a daughter I knew that.

10          THE COURT:  Is there anything that would make it

11   difficult or impossible to be fair?

12          VENIREPERSON NO. 29:  No.

13          THE COURT:  Do you know the nature of that suit?

14          VENIREPERSON NO. 29:  Asbestos.

15          THE COURT:  Okay.  Thank you.  Anyone else now

16   before we get to the jury box?  Okay.  Yes, No. 4.

17          VENIREPERSON NO. 4:  Juror No. 4.  I have a brother

18   that was involved in a lawsuit with regards to asbestos and

19   then another brother that was -- I believe he brought a

20   lawsuit with regards to workmen's comp injury.

21          THE COURT:  Anything about any or all of those

22   actions that would make it difficult or impossible for you to

23   be fair in this case?

24          VENIREPERSON NO. 4:  No.

25          THE COURT:  Thank you.  Yes.  No. 5.

1          VENIREPERSON NO. 5:  I was for a wrongful death for

2    my mother.

3          THE COURT:  How long ago?

4          VENIREPERSON NO. 5:  About eight years ago.

5          THE COURT:  Anything about that that would make it

6    difficult or impossible for you to be fair and impartial in

7    this case?

8          VENIREPERSON NO. 5:  No.

9          THE COURT:  Thank you.  Second row?  Third row.

10   Yes, No. 11.

11         VENIREPERSON NO. 11:  No. 11.  I was a plaintiff in

12   a lawsuit against a former employer.

13         THE COURT:  Anything about that, sir, that would

14   make it difficult or impossible for you to be fair and

15   impartial in this case?

16         VENIREPERSON NO. 11:  No, sir.

17         THE COURT:  All right.  Thank you, sir.  Yes.  Your

18   number?

19         VENIREPERSON NO. 15:  Fifteen.  We just did a

20   stepchild adoption.  It was in court.  I don't know if

21   that --

22         THE COURT:  Well, thanks for raising it.

23         VENIREPERSON NO. 15:  We had an attorney.

24         THE COURT:  That's fair.  I was a state court judge

25   for 17 years before coming here and those were happy days, so

1    there's nothing adversarial about that.

2          VENIREPERSON NO. 15:  No, it was good.

3          THE COURT:  All right.  Anyone else who was in a

4    lawsuit.  Okay?

5          We know very little about each of you.  There's been

6    no attempt to do any media searches or anything about you.

7    It would be helpful to the parties if you would explain a

8    little bit about yourself.  For example, hobbies, employment,

9    family, anything like that that you think would be helpful.

10   We'll start with Juror No. 1.

11         VENIREPERSON NO. 1:  Hello.  I'm Juror No. 1.  It's

12   my first time here.  I'm a little nervous.  I've lived in St.

13   Louis maybe like six years.  I grew up in Michigan.  I don't

14   really have very many hobbies.  I play tennis, that's about

15   it, and I watch TV.  I work every day and then I go home and

16   I cook dinner and watch television, so that's my life every

17   day.

18         THE COURT:  All right.  Thank you.  Sounds like a

19   good life.  No. 2, any hobbies or employment or family

20   members or anything like that you'd like to discuss?

21         VENIREPERSON NO. 1:  Oh, me?

22         THE COURT:  No, No. 2.

23         VENIREPERSON NO. 2:  No.  I have a lot of hobbies.

24   But I have raised five children and I have 15 grandchildren

25   and 14 great grandchildren.  I keep busy just taking care of

1    them.  And I do embroidery.

2            THE COURT:  You said embroidery?

3            VENIREPERSON NO. 2:  Embroidery and reading and that

4    sort of thing.

5            THE COURT:  Thank you.  Next.

6            VENIREPERSON NO. 3:  Juror No. 3.  I live in St.

7    Charles.

8            THE COURT:  I'm having trouble hearing you.  I'm

9    sorry.

10           VENIREPERSON NO. 3:  Juror No. 3, I live in St.

11   Charles.  I've lived there for 20 years.  I'm a first time

12   parent, me and my husband just had a baby in January and I

13   work full-time.

14           THE COURT:  All right.

15           VENIREPERSON NO. 3:  So that's my hobby right now,

16   taking care of my baby.

17           THE COURT:  No. 4, next.

18           VENIREPERSON NO. 4:  I'm sorry, Juror No. 4.  I am

19   married with three adult children, four grandchildren.  I

20   work full-time outside the home as an advocate.  And my hobby

21   is my four chickens and a puppy.

22           THE COURT:  All right.  Thank you.  Next.

23           VENIREPERSON NO. 5:  Juror No. 5.  My name is

24   Dolores Zweifel.  I have three grown children.  I work

25   outside the home in an automotive company making rubber parts

1    for your door seals.  I really don't have any hobbies because

2    my grandkids take all my time.  I cook a lot.  Don't get a

3    lot of sleep.  On the go all the time.  That's about it.

4            THE COURT:  Thank you.  Yes, No. 6.

5            VENIREPERSON NO. 6:  Juror No. 6.  Been married for

6    14 years.  I work at United Healthcare.  Been there for 12

7    years.  I have two boys starting school on Thursday, one

8    starting kindergarten and one starting middle school.  So

9    they take up most of my time.  And my husband is a pastor and

10   that takes up a lot of my time also.

11           THE COURT:  All right.  Thank you.  Yes, sir.

12           VENIREPERSON NO. 7:  Juror No. 7.  I'm Mark Amen.

13   I'm a civil engineer with the St. Louis County Highway

14   Department.  I've got two children grown, and my hobbies are

15   photography and art.

16           THE COURT:  Thank you.  What kind of camera

17   equipment?

18           VENIREPERSON NO. 7:  Nikon.

19           THE COURT:  Okay.  Maybe we could visit about that

20   some time.

21           VENIREPERSON NO. 7:  Sure.

22           JUROR NO. 8:  Good morning, I'm Juror No. 8, Andrew

23   Bequette.  I work for the federal government so it takes up a

24   lot of my time.  I'm married.  I have one daughter who is six

25   years old.  And hobbies with a six-year-old, I don't have

1    time for hobbies.  Golf, basketball, just typical sports

2    stuff, but other than that I'm pretty boring.

3              THE COURT:  How do you shoot, pretty good?  Pretty

4    good golfer?

5              JUROR NO. 8:  Me?  Oh, no.

6              VENIREPERSON NO. 9:  I'm Juror No. 9.  My name is

7    Jerry Hardcastle.  I go to school full-time.  I'm 20.  I'm

8    the oldest of three kids.  I played some college soccer.  And

9    right now I pretty much -- I live in Pacific.  I drive to

10   UMSL three times a week about, so my hobby is listening to

11   the radio in the car.

12             VENIREPERSON NO. 10:  Juror No. 10, Steve Thomas.  I

13   grew up in Illinois on a family farm.  I've been working for

14   Boeing for 41 years as a mechanical engineer.  Hobbies, I'm

15   an off road motorcycle rider, believe it or not still.

16   Founder of the national -- one of the founders of National

17   Off-Highway Vehicle Conservation Council, member of Midwest

18   Trail Riders.  Other hobbies I also shoot in local IDPA

19   handgun and free gun matches in the area.

20             THE COURT:  All right.  Thank you, sir.  Yes,

21   No. 11.

22             VENIREPERSON NO. 11:  Paul McLafferty, No. 11.  I'm

23   a retired union painter.  And my hobbies are I like to go on

24   motorcycle trips.  Spend a lot of time hunting in the fall.

25   Certified gunsmith.  I also like to shoot handguns.  And I've

 1   got two grandkids that I baby-sit for, one of them three days

 2   a week.  And that's about it.

 3            THE COURT:  All right.  Thank you, sir.  Yes,

 4   No. 12.

 5            VENIREPERSON NO. 12:  I'm Juror No. 12.  My name is

 6   Brittany.  I worked in radiological safety.  I worked in

 7   radiological health science.  I switched and now I'm in

 8   cosmetology, so I want to own my own business.  So that's

 9   what I'm up to lately, but I'm taking a little break and

10   spending a lot of time with my parents who have health issues

11   and my niece and nephews.

12            THE COURT:  Thank you.  Thirteen.

13            VENIREPERSON NO. 13:  I'm Juror No. 13, my name is

14   Nathan, and I'm a full-time mechanic.  I'm 19 years old.  I'm

15   also in the band called Free Parking.  We'll be playing at

16   Ballpark Village in a couple weeks so come see us.  I own a

17   Firebird.  That's about it.  Thank you.

18            THE COURT:  Thank you.

19            VENIREPERSON NO. 14:  Juror No. 14, my name is Dera

20   Luce.  I grew up in Utah and Southern California and moved

21   here for school.  Three of my four siblings are lawyers, but

22   I actually work at the school.  My hobbies are programming

23   and foreign languages, so I also speak Spanish and Japanese.

24            VENIREPERSON NO. 15:  My name is Leslie, I'm Juror

25   15.  I'm married.  I have five daughters ages eight to 18,

1      and in my spare time I sell real estate.

2              THE COURT:  Okay.  Thank you.

3              VENIREPERSON NO. 16:  I'm Juror No. 16, my name is

4      Natalie Garrett.  I'm married.  I am expecting my first child

5      on the way.  And I work for a not-for-profit called Harris

6      House Foundation.  We are a drug and alcohol treatment

7      facility.  So I do all their outreach and director of

8      admissions.

9              THE COURT:  Next.

10             VENIREPERSON NO. 17:  Juror No. 17, Shawn Icenhower.

11     I have no kids.  I'm not married.  I've got nine nieces and

12     nephews and try to spend as much time as I can with them.

13     We're pretty close.  Hobbies would be shooting handguns,

14     riding motorcycles on road, and golf.  And my background is

15     23 years in nursing at the bedside in the emergency

16     department and EMS as well.

17             THE COURT:  Thank you.

18             VENIREPERSON NO. 18:  I'm Juror No. 18.  I am

19     unemployed slash retired.  I lost my job after almost 40

20     years about four years ago and I stay at home.  I have an

21     adult son and a granddaughter that live in my home with me.

22     I'm the predominant care provider for my granddaughter.  Her

23     mother is not involved.  And my son has issues that limit

24     him.  And I spend time with my father that lives in Southeast

25     Missouri.  So I go regularly back and forth to see my

1  84-year-old father.  And I have a puppy and do Girl Scouts.

2         VENIREPERSON NO. 19:  I'm Juror 19, Anthony Goodson.

3  I'm an engineer by education but I've worked in the casino

4  gaming industry for about 14 years, and I don't have very

5  many interesting hobbies.

6         VENIREPERSON NO. 20:  I'm Juror No. 20.  I have four

7  children.  I am a kitchen manager at my children's school.  I

8  like to spend time with my family.

9         THE COURT:  Thank you.

10        VENIREPERSON NO. 21:  No. 21.  I've been married 38

11 years.  I have two children, three grandchildren.  I'm one of

12 three owners of a non-profit boys home.  My wife goes on

13 vacation once or twice a year and I don't.

14        VENIREPERSON NO. 22:  My name is Laketa Carrell.  I

15 need to backtrack to the legal question.  You asked me about

16 being part of a suit.  We -- I've been audited as a therapist

17 by Medicaid and we had to -- well, I didn't have to but I did

18 seek the help of an attorney and we ended that amicably.  And

19 I don't believe it will interfere with this case but I do

20 think maybe I should say that.

21        THE COURT:  I take from your response that there's

22 nothing about that that would make it difficult or impossible

23 for you to be fair in this case.

24        VENIREPERSON NO. 22:  No, I don't think so.

25        THE COURT:  Thank you for raising that.  What you

1    just mentioned is something that's very common.  And I

2    forgot -- I usually tell people that.  If during the course

3    of these questions you were asked a question and didn't

4    respond and then later something occurred to you, you know, I

5    should have answered that, what do I do now, it's too late.

6    No, it's not too late.  Just raise your hand and say just

7    exactly what you did, I forgot maybe I should have answered

8    something, a question way back.  That's okay.  The important

9    thing is to get the information.  Thank you.  Next.

10   VENIREPERSON NO. 22:  Well, my name is Laketa

11   Carrell.  I'm a family therapist.  I've been in business for

12   myself for 20 years self-employed.  Let's see, I have one

13   beautiful grandchild, she's one years old, my only

14   grandchild.  I like fishing.  I like sewing, reading, and we

15   have a television show that's going to be starting, who knows

16   when, in December, whatever, the dates keep getting pushed

17   back.  And I think that's about it.

18   THE COURT:  What's the biggest fish you ever caught

19   or the biggest fish you said you caught?

20   VENIREPERSON NO. 22:  The biggest fish I caught and

21   my husband let go was a carp, a huge carp over in Illinois.

22   THE COURT:  Okay.  Next.

23   VENIREPERSON NO. 23:  Juror No. 23.  My name is

24   David.  I'm married with a two-year-old.  I enjoy being a

25   good father.  I'm also from the city of St. Louis.  I enjoy

1    the finer things in life, flying fish, rock climbing.

2         THE COURT:  Where do you rock climb?

3         VENIREPERSON NO. 23:  All over the world.  Would you

4    like to come with me, sir?

5         THE COURT:  That would be an interesting experience.

6    I have no or little experience, but I always admire those who

7    do that sport.  Thank you.  Next.

8         VENIREPERSON NO. 24:  Twenty-four.  My name is Ben.

9    I live about an hour and a half south of the city.  I work

10   for the State Highway Department.  Very few hobbies.

11        THE COURT: Okay.  Thank you, sir.

12        VENIREPERSON NO. 25:  Twenty-five.  I'm a retired

13   college professor and semi-retired musician.  My hobbies are

14   besides music, photography.

15        THE COURT:  I don't get the opportunity to

16   cross-examine anyone during this case.  I would like to some

17   time.  What did you teach?

18        VENIREPERSON NO. 25:  Physics.

19        THE COURT:  And since you're semi-retired, I assume

20   you still rap a little bit once in awhile, is that it?

21        VENIREPERSON NO. 25:  I'm supposed to have rehearsal

22   tomorrow night, and I don't think I'll make it.  I'm putting

23   the band back together.

24        VENIREPERSON NO. 26:  Juror 26, Pamela Weber.  I

25   moved to St. Louis about three years ago, recently got

1   married to my husband who is from here, which is why we moved

2   here.  I'm from Chicago.  I'm getting my MBA at UMSL right

3   now.  I like traveling when I'm not studying, working,

4   running, hanging out with my dog.  That's about it.

5           THE COURT:  National travel?  International travel?

6           VENIREPERSON NO. 26:  Both.

7           THE COURT:  Both.  Okay.  Next.  Thanks.  Next.

8           VENIREPERSON NO. 27:  Juror 27, born and raised in

9   St. Louis.  Married, seven children, another 30 nieces and

10  nephews.  Enjoy soccer, St. Louis Blues hockey for my hobbies

11  and hanging out with my children.

12          THE COURT:  Are we going to get a St. Louis soccer

13  team?

14          VENIREPERSON NO. 27:  I hope so.

15          VENIREPERSON NO. 28:  I'm Juror 28.  I've been

16  married 38 years.  I have two adult daughters and they both

17  have a child and we've got another grandchild on the way.

18  And I love to go garage saling.

19          THE COURT:  Okay.

20          VENIREPERSON NO. 28:  And estate sales.

21          THE COURT:  Have you picked up any Rembrandts or

22  anything like that?

23          VENIREPERSON NO. 28:  No, but I get some pretty good

24  stuff.

25          THE COURT:  No. 29.

1          VENIREPERSON NO. 29:  My name is Laura Carruthers,

2     Juror No. 29.  We have no family that is here, all of our

3     family is down south.  I do have a German Shepard who happens

4     to be my shadow, although she's not with me today.  I do have

5     a lot of hobbies.  I'm not much on getting out.  I had a car

6     accident a couple years ago and if I don't have to drive, I

7     don't drive.  And that's it.  I do have a lot of different

8     hobbies at home, and keeping track of that and taking care of

9     my husband.

10          THE COURT:  Thank you.  I shall not indicate my

11     opinion about -- well, I have first of all before I give you

12     those I have some additional questions, have any of you or

13     anyone close to you been a member of any class action

14     lawsuit?  Okay.  Juror No. 4.

15          VENIREPERSON NO. 4:  Yes.  Juror No. 4.  It was a

16     class action lawsuit with regards to the banking, housing

17     thing four or five years ago.

18          THE COURT:  Okay.  Four or five years ago?

19          VENIREPERSON NO. 4:  Uh-huh.

20          THE COURT:  Thank you.  Next.

21          VENIREPERSON NO. 5:  I was in one.

22          THE COURT:  That's No. 5, Juror No. 5, correct?

23          VENIREPERSON NO. 5:  Yes.  I was in one 13 years

24     ago, and it was due to managers being underpaid.

25          THE COURT:  Okay.  Yes.

1          VENIREPERSON NO. 6:  No. 6.  It was with my job so

2     one of the employees had a suit against the company in

3     regards to pay.

4          THE COURT:  Okay.  Just a second.  Anyone else in

5     the jury box?  Okay.  In the center row?  Yes, sir.

6          VENIREPERSON NO. 19:  Juror 19.

7          THE COURT:  Go ahead.

8          VENIREPERSON NO. 19:  I've been involved in a

9     couple, but they were all small, for small products or food

10    items or whatever.  But I'll take this chance to mention if

11    this is a class action lawsuit --

12         THE COURT:  Yes.

13         VENIREPERSON NO. 19:  -- involving Mike Huckabee in

14    some way, I received a card about that.  I don't know if that

15    matters.

16         THE COURT:  Just a moment.  What I'm going to do is

17    when the other jurors are excused, I'm going to ask you to

18    remain and we may have some more questions for you about

19    that.  I want to make sure there is full disclosure by me and

20    the lawyers to you.

21         Any other person in the center, class action, 29?

22    Go ahead.

23         VENIREPERSON NO. 29:  I'm No. 29.  I mentioned

24    earlier about asbestos, and I don't know if that falls under

25    that category or not.

1          VENIREPERSON NO. 17:  Your Honor, No. 17.  I think

2     the gentleman talked about Huckabee.  I think I received

3     something like that in the mail.

4          THE COURT:  I'll ask you to remain also.  Just a

5     second.  I'll ask No. 17 and 19 not to answer this next

6     question but everyone else who raised a hand and said

7     they had been involved in a class action.  Is there anything

8     about your experiences that would affect your ability to be

9     fair and impartial in this case?  Those who raised their

10    hand, is there anyone?

11         VENIREPERSON NO. 6:  Six.  No.

12         VENIREPERSON NO. 4:  No.

13         VENIREPERSON NO. 5:  No.

14         THE COURT:  Okay.

15         VENIREPERSON NO. 27:  I had something to disclose.

16         THE COURT:  All right.  Go ahead.

17         VENIREPERSON NO. 27:  One was a securities for

18    K-Mart trading, so K-Mart stock, securities settlement.  One

19    was for the Reserve Fund, just an investment from a class

20    action.

21         THE COURT:  Is there anything about those that would

22    make it difficult or impossible for you to fair and impartial

23    in this case?

24         VENIREPERSON NO. 27:  No.

25         THE COURT:  Is there anyone on the panel that has

1   any bias either in favor or against class action lawsuits?

2   We'll start with the jury box this time.  No hands.  Any in

3   the center section or the next section?  Okay.

4       There are a couple of you who are going to be

5   answering this question I know.  Have any of you heard

6   anything at all about any lawsuits or verdicts in cases

7   involving robocalls?  Okay.  No hands.

8       Is there anyone who has their phone number listed on

9   something called a "no call" or "do not call" list?  All

10   right.  Let's go in the jury box and just identify yourself

11   by number on the front row, please.  First.

12       VENIREPERSON NO. 2:  No. 2.

13       THE COURT:  No. 2?

14       VENIREPERSON NO. 2:  I've been registered with the

15   state for no calls --

16       THE COURT:  Right.

17       VENIREPERSON NO. 2:  -- but still get them.

18       THE COURT:  Sure.  I understand.

19       VENIREPERSON NO. 4:  I'm No. 4.  Ditto.

20       THE COURT:  Second row, No. 6.

21       JUROR NO. 8:  No. 8.

22       THE COURT:  No. 8.

23       JUROR NO. 8:  Yep.

24       THE COURT:  Okay.  Thank you.

25       VENIREPERSON NO. 10:  No. 10.

1          THE COURT:  No. 10, just a second.

2          VENIREPERSON NO. 14:  No. 14.

3          THE COURT:  There's nothing about this that will be

4    disqualifying, it's just a question I had to answer.  No. 16.

5          VENIREPERSON NO. 16:  No. 16.

6          THE COURT:  Sixteen.

7          VENIREPERSON NO. 16:  Fifteen.

8          VENIREPERSON NO. 15:  Fifteen.

9          THE COURT:  Sorry?

10          VENIREPERSON NO. 17:  Seventeen.

11          VENIREPERSON NO. 12:  No. 12.  I'm not sure, it

12    would have been a long time ago.

13          THE COURT:  Anyone else in the jury box that I

14    haven't --

15          THE CLERK:  17 and three.

16          THE COURT:  17 and three.  Okay.  Go ahead.

17          VENIREPERSON NO. 3:  Your Honor.

18          THE COURT:  Just a moment, please.  Okay, just a

19    second.  Okay.  Go ahead.

20          VENIREPERSON NO. 3:  Juror No. 3.  I don't know if

21    this qualifies, but in the mail I've received from -- there's

22    a class action lawsuit, Burlington Company, and you got a

23    refund because there were price -- something with price

24    discrepancy, and they stated you shop here so here's a

25    refund, and I don't know if that counts.

1          THE COURT:  Well, thanks for the disclosure, I don't

2    think so, but thank you for the disclosure.  And in the

3    center section, anyone on the "no call" list?

4          VENIREPERSON NO. 18:  Eighteen.

5          THE COURT:  What's the number?

6          VENIREPERSON NO. 18:  No. 18.

7          THE COURT:  Go ahead.  No call?

8          VENIREPERSON NO. 18:  Yes.

9          VENIREPERSON NO. 19:  Nineteen.

10         THE COURT:  Nineteen, no call.

11         VENIREPERSON NO. 22:  Twenty-two.

12         THE COURT:  Twenty-two.  Okay.

13         VENIREPERSON NO. 25:  Twenty-five.

14         THE COURT:  Twenty-five.

15         VENIREPERSON NO. 27:  Twenty-seven.

16         THE COURT:  Twenty-seven.

17         VENIREPERSON NO. 28:  Twenty-eight.

18         THE COURT:  Okay.  Thank you.  Is there anyone on

19    the panel who would have a bias against people who are

20    plaintiffs in a class action lawsuit involving robocalls?

21    Would any of you have a bias against people who are

22    plaintiffs in a class action lawsuit about robocalls?  I see

23    no hands.

24          Do you have any bias against people or companies who

25    are defendants; that is, people or companies alleged to be

1    responsible for calls in a class action lawsuit about

2    robocalls?  Let me ask it again.  Do you have any bias

3    against people or companies who are defendants; that is,

4    people or companies alleged to be responsible for the calls

5    in a class action lawsuit about robocalls?  I see no hands.

6             This case involves a movie called *The Last Ounce of*

7    *Courage*.  Has anyone seen or heard anything about the movie

8    *The Last Ounce of Courage*?  Yes.

9             VENIREPERSON NO. 20:  No. 20.  I've seen the movie.

10            THE COURT:  You have seen it?

11            VENIREPERSON NO. 20:  Yes.

12            THE COURT:  Okay.  Just a second.  Anyone else?

13   Just a second.  This case involves an automated telephone

14   call campaign or robocall campaign marketing the movie.  Did

15   anyone receive a telephone call or know anything about anyone

16   who received a telephone call about the movie?  We've had a

17   hand on No. 17 and No. 19.  Now let me ask the question again

18   generally.  The case involves an automated telephone call

19   campaign, a robocall campaign marketing the movie.  Did

20   anyone receive a telephone call or know anyone who received a

21   telephone call about the movie?  And we'll be asking No. 17

22   and 19 questions a little later.  Anyone else that may have

23   any information like that?  All right.

24            The movie was aimed at conservative Christian

25   audiences.  Does anyone have any strong feelings one way or

1 another about conservative Republican politics or

2 conservative Christian groups?  Okay, there are some hands.

3         Starting on the first row, second row.  The question

4 is:  The movie was aimed at conservative Christian audiences.

5 Does anyone have any strong feelings one way or the other

6 about conservative Republican politics or conservative

7 Christian groups?  And I saw some hands.  The second row, I

8 saw a hand on the back row.  Yes, that would be No. 14.

9         VENIREPERSON NO. 14:  Fourteen.

10         THE COURT:  Go ahead.

11         VENIREPERSON NO. 14:  Yeah, it's really interesting,

12 but I was raised Mormon.  I got out when I was like 19.  And

13 I had a lot of life stuff that was in conflict with that.

14         THE COURT:  Thank you.

15         VENIREPERSON NO. 16:  Sixteen.

16         THE COURT:  Go ahead.

17         VENIREPERSON NO. 16:  There's nothing wrong -- I'm

18 Jewish and I just see differently.  And my political views

19 are completely the opposite of conservatives.

20         THE COURT:  Okay.  Don't anyone ever feel

21 reticent or reluctant to answer these questions.

22         VENIREPERSON NO. 16:  But I love everybody.  Just

23 because we have different opinions and religions does not

24 mean anything.

25         THE COURT:  I understand.  That's really the reason

1  for the question.  And thank you for having the courage to

2  speak up.  Anyone else?  Yes, sir, No. 17.

3          VENIREPERSON NO. 17:  Yes, I support both the

4  Christian beliefs and conservative politics.

5          THE COURT:  Okay.  Two.

6          VENIREPERSON NO. 2:  No. 2, I support both.

7          THE COURT:  Okay.  Yes, number -- I'll go this way

8  first.  Yes, sir.

9          VENIREPERSON NO. 21:  Twenty-one.

10         THE COURT:  Twenty-one.  Go ahead.

11         VENIREPERSON NO. 21:  I'm probably the most

12  conservative person in this room, extremely conservative.

13         THE COURT:  Thank you, sir.  Yes, 21 -- 22.

14         VENIREPERSON NO. 22:  Strong liberal.

15         THE COURT:  Would you all like to be reseated?

16  Okay.  Thank you.  Yes, sir.

17         VENIREPERSON NO. 24:  Twenty-four.  Conservative

18  Christian.

19         THE COURT:  What number?

20         VENIREPERSON NO. 24:  Twenty-four.  Conservative

21  Christian, but I love everyone too.

22         THE COURT:  Yes, 25.

23         VENIREPERSON NO. 25:  I'm a retired physicist so I

24  am opposed to both.

25         THE COURT:  You're opposed to both?

1        VENIREPERSON NO. 25:  Both the Christian religion

2    and conservative politics.

3        THE COURT:  Yes.  No. 26.

4        VENIREPERSON NO. 26:  I'm fiscally conservative,

5    socially liberal.

6        THE COURT:  Okay.

7        VENIREPERSON NO. 27:  I support both.

8        THE COURT:  I'm sorry?

9        VENIREPERSON NO. 27:  I support both.

10        THE COURT:  Both, okay.  Just a second.  Yes,

11    No. 29.  Go ahead.

12        VENIREPERSON NO. 29:  I'm 29.  I'm a conservative

13    Christian and I believe in the Lord Jesus Christ.

14        THE COURT:  Did I get everyone on that subject?

15    Okay.

16        I shall not indicate my opinion about any of the

17    facts of the case.  It is your duty to decide the facts and

18    my duty to rule questions of law.  Because of lifetime

19    experiences, television, training, or otherwise you may have

20    a firm idea of what the law is or should be so you would be

21    unwilling to follow the law.  Is there anyone who does not

22    understand that it is your duty to follow the law if the

23    Court gives it to you even though you may disagree with it or

24    think it should be different?  The ultimate question really

25    is if you're selected as a juror will you follow the law even

1    though you may think the law is incorrect?

2           Is there anyone who can think of any matter or

3    experience in your life that would prevent you from being a

4    completely fair and impartial juror in this case other than

5    for reasons we've already discussed?

6           Is there anyone who will not if selected as a juror

7    return a verdict based solely on the evidence and the law as

8    the Court gives it to you?

9           Is there anyone who has any prejudice against a

10   plaintiff coming into court seeking money damages?

11          Does each member realize that this is the only

12   method of recompense under our system of law if the plaintiff

13   proves the case to you under the proper standard of proof by

14   the greater weight of the evidence?  Okay.

15          Is there anyone who has any quarrel with the

16   proposition that in order for plaintiff to recover, he, she,

17   or it must first prove the case by a preponderance of the

18   evidence or by a greater weight of the evidence?  Those

19   things mean the same, preponderance of the evidence or

20   greater weight of the evidence.  We hear them in different

21   context but they mean the same thing.  Is there anyone who

22   has any quarrel with that proposition?

23          In all the years of doing this I've only had two

24   cases where objections were not made.  Very rare that

25   objections aren't made.  But does any person on the panel

1    realize that objections will be made, and if that occurs is

2    there anyone who will hold it against the side making an

3    objection?  Attorneys have a right and a duty to make

4    objections from time to time, and the question is will you

5    hold that against the party?  I see no hands.

6         We're going to be taking a recess in just a few

7    minutes, but the plaintiffs will have an opportunity to talk

8    to you and then the defendants will have a chance to talk to

9    you, ask you questions.

10        We're going to take a recess.  Until this case is

11   given to you to decide, you must not discuss the case among

12   yourselves, with others, or remain in the presence of anyone

13   discussing it.  If anyone should try to talk to you about the

14   case, advise me immediately or as soon thereafter as you

15   possibly can.

16        Court is going to be in recess now for 15 minutes.

17   Please return to the jury room a little before that time and

18   be prepared to be escorted back to the jury room when you

19   come back.  When you come back in, there will be someone at

20   the door waiting for you and you will be told to go back to

21   your seats that have been assigned to you.

22        Court's in recess for 15 minutes.

23        (Jury panel excused from courtroom.)

24        THE COURT:  17 and 19, remain, please.  Yeah, don't

25   be concerned about this.  The reason I wanted to ask you to

1    stay, we're going to have a conference up here with each of

2    you.  You mentioned Governor Huckabee, and I just want to

3    make sure the record is clear about that.  And I didn't want

4    you to say something in the presence of the other jurors that

5    might influence them one way or the other.  So if counsel

6    would come up please, we'll have a bench conference.  Juror

7    No. 17 first, please.

8             (The following proceedings were held at the bench

9    with Venireperson No. 17 and counsel and outside the hearing

10   of open court:)

11            THE COURT:  During the questioning Governor

12   Huckabee's name was mentioned, and I wasn't exactly sure, I

13   got the impression that you had gotten a call or something.

14   Could you just tell me what your association is with --

15            VENIREPERSON NO. 17:  I think I recall receiving

16   something in the mail, just a little card about a class

17   action suit, and like all others, I just throw them away.

18            THE COURT:  Okay.  And Huckabee was mentioned in

19   that?

20            VENIREPERSON NO. 17:  Huckabee, I believe he was

21   mentioned on that little card.

22            THE COURT:  Okay.

23            VENIREPERSON NO. 17:  I don't remember the -- what

24   it was in reference to, I just saw class action and threw it.

25            MR. SIMON:  Did you do anything other than throw it

1      away?  You just threw it away?  No questions, Your Honor.

2              THE COURT:  That's all.  Thank you.  You can go

3      ahead and take a break.

4              (The following proceedings were held at the bench

5      with Venireperson No. 19 and counsel and outside the hearing

6      of open court:)

7              THE COURT:  Thanks for coming up.

8              VENIREPERSON NO. 19:  Sure.

9              THE COURT:  The reason we asked you to stay, the

10     name Huckabee was mentioned, and I didn't want someone to say

11     something that would influence other jurors.  What happened

12     in your experience in that regard?

13             VENIREPERSON NO. 19:  The only thing was I got two

14     typical class action postcards in the mail the same day, both

15     addressed to me at the same address.  They were exactly the

16     same.  They had different class action numbers on them or

17     whatever, but other than that they were exactly the same.  I

18     looked at it.  I noticed Governor Huckabee's name and then a

19     long list of other names.  The card said if you want to

20     remain in the class action, you don't do anything, so I

21     didn't do anything.  That's it.

22             THE COURT:  All right.  Let me ask you, do you have

23     any inclination to remain a class member?

24             VENIREPERSON NO. 19:  I wasn't planning on doing

25     anything, which to my understanding leaves me in the class,

1    so --

2              THE COURT:  Okay.  All right.

3              MR. SIMON:  No questions, Your Honor.

4              MR. SCHWALB:  Nothing.

5              MR. LUDWIG:  I have one question, sir.  You said you

6    received two cards in the mail and they had two different

7    case numbers on them?

8              VENIREPERSON NO. 19:  I don't think they were -- I

9    thought it was weird that I got two different cards.  They

10   were both addressed to me.  No one else lives in my house.

11   There was a number -- a long number on the card, and they

12   were different.  That's all I know.

13             MR. LUDWIG:  I understand.  And this was Fredrick

14   Ludwig for the record, Judge.

15             THE COURT:  If for some reason receiving that notice

16   would include you in the class action, do you have any

17   intention of remaining in the class -- in the class action?

18             VENIREPERSON NO. 19:  I would say yes.

19             THE COURT:  Okay.  Thank you.

20             MR. SIMON:  Thank you.

21             THE COURT:  Anything else about that matter, we'll

22   take it up a little later.  All right.

23             (Court in recess from 10:41 a.m. until 10:53 a.m.)

24             (The following proceedings were held outside the

25   hearing of the jury panel:)

1          THE COURT:  On the defendants' side of the case,

2     will you do a quick survey to make sure everyone is here.

3          MR. SCHWALB:  I believe so, Your Honor.

4          THE COURT:  I've had a request to take something up

5     before the jury returns.  Go ahead.

6          MR. SCHWALB:  Brian Schwalb on behalf of

7     Dr. Leininger.  In the Court's description of the parties in

8     the case, Your Honor mentioned several parties that are not

9     current parties in the case.

10          THE COURT:  All right.  Okay.

11          MR. SCHWALB:  And I'm wondering if that ought to

12     corrected.  You mentioned Enthuse Entertainment, Bob Brewer,

13     and SixDi as being parties.  They are not currently parties

14     in the case.

15          THE COURT:  All right.  Let's mark them off, and

16     I'll make that change.  First you mentioned --

17          MR. SCHWALB:  Enthuse Entertainment.

18          THE COURT:  All right.  Go ahead.

19          MR. SCHWALB:  And SixDi.

20          THE COURT:  Just a moment.  Okay.  Go ahead.

21          MR. SCHWALB:  And Bob Brewer.  They I believe at one

22     time were named but are not currently defendants in the case.

23          THE COURT:  Okay.  Thank you.

24          MR. SCHWALB:  Second request, Your Honor, is that

25     there is another law firm and set of plaintiffs' lawyers that

1    are counsel that were not introduced to the jury, Mr. Schultz

2    and Mr. Eisenberg who I believe are here, and just out of an

3    abundance of caution since their names may come up during the

4    course of the trial, we ought to suss out whether any of the

5    members of the panel know Mr. Eisenberg or Mr. Schultz or

6    their law firm.

7         THE COURT:  Okay.  Could I have the full names of

8    those individuals?

9         MR. SCHULTZ:  Rob Schultz.

10        MR. EISENBERG:  Ronald Eisenberg.  And also Eastern

11   Gate was one of the parties that I believe Your Honor

12   mentioned that is not a party.

13        THE COURT:  Which one, Mr. Eisenberg?

14        MR. EISENBERG:  I believe you said Eastern Gate.

15        THE COURT:  Okay.  Eastern Gate?

16        MR. EISENBERG:  Yes.

17        THE COURT:  All right.  Thank you.  I shall mention

18   that the names that are no longer parties and mention

19   Mr. Schultz and Mr. Eisenberg.

20        MR. SCHWALB:  Thank you, Your Honor.

21        MR. SIMON:  And, Your Honor, for the plaintiffs, we

22   questioned Jurors 17 and 19, and based upon Your Honor's

23   questioning it appears as if they are class members.  Based

24   on that plaintiffs request and believe that they probably --

25   they are plaintiffs in the case, they are in the class, they

1    are being represented, their issues -- their interests are at

2    issue here, and we're thinking that maybe they should be

3    excused rather than sit through the rest of the questioning.

4         MR. SCHWALB:  Your Honor, I agree with respect to

5    19, who Your Honor specifically asked whether he intended to

6    remain as a member of the class.

7         No. 17 did not say that.  He was not asked directly

8    by Your Honor, and maybe we ought to clear that up.  He had a

9    decidedly different reaction to the questions.  He said he

10   threw the card away.  So maybe we need a clarification as to

11   whether he considers himself or intends to remain as a part

12   of the class.

13        MR. SIMON:  And, Your Honor, that's why I asked the

14   question.  First of all, it's past the time to opt out.  He

15   doesn't have a choice, his interests are bound by what

16   happens in this case.  He can't opt out, it's past the time.

17   And I did ask the question, "Did you do anything other than

18   take the notice and throw it away?"  His answer was, "That's

19   all I did."  Based on his testimony, he did not opt out.  It

20   is past the time to opt out, and we think for that reason he

21   should be handled similarly to Juror 19.

22        THE COURT:  Do you have any objection if I dismiss

23   both of those jurors?

24        MR. SCHWALB:  I think given the answers to the

25   Court's question, they are in different positions, and I

1    would at least ask the Court clarify whether 17 has the same

2    view of the situation as 19.

3         THE COURT:  I think Mr. Simon raises a good legal

4    argument, he may be in whether he wants to be or not.  But I

5    will bring him in.  Will you locate Juror No. 17, please, and

6    bring him in for further questions.

7         And just so I get it right, Enthuse Entertainment,

8    Eastern Gate, Bob Brewer, and SixDi, Inc., the jury -- the

9    panel needs to be advised that those were former parties.  Is

10   that a satisfactory way to --

11        MR. SIMON:  Or just that they are currently not

12   defendants in this case, that's the way we would request it

13   be phrased, Your Honor.

14        THE COURT:  Did I get them all?

15        MR. SCHWALB:  Yes, sir.

16        THE COURT:  All right.  Thank you.

17        (The following proceedings were held in open court

18   outside the hearing of the jury panel with Venireperson No.

19   17:)

20        THE COURT:  I had one more question that I should

21   have asked and I didn't.  This is Juror No. 17, and has

22   previously been asked some questions.  Your answers were

23   given.  There's nothing that you said that causes you to come

24   back.  I had one more question.  Did you intend to remain a

25   member of the class in this case?  I guess that's the

1    question.

2          VENIREPERSON NO. 17:  Can -- a little further

3    explanation?

4          THE COURT:  Well, the question is having received

5    the notice that you were included in the class, and you

6    haven't taken any as I understand it any official action to

7    be removed from the class, is it your intention to remain a

8    class member of the action?

9          VENIREPERSON NO. 17:  No, as I said, I just threw it

10   away as I do with any of those that come in the mail.

11         THE COURT:  All right.  Okay.  I'm going to ask that

12   you go back outside.  I have some more questions for the

13   attorneys.  Thank you, sir.

14         (Venireperson No. 17 was dismissed from the

15   courtroom.)

16         MR. SIMON:  Your Honor, it is clear now from his

17   testimony, if it wasn't before, that he did not exercise his

18   right to opt out of this class action, therefore he is

19   currently a member of this class action and his rights will

20   be at issue in this case.  And for that reason we think along

21   with Juror 19 that he should be dismissed at this time.  And

22   obviously as Your Honor knows, we've got plenty of jurors,

23   that's not going to be a problem.

24         THE COURT:  Mr. Schwalb.

25         MR. SCHWALB:  Thank you, Your Honor.  I think the

1    answer that the juror gave showed decidedly that he has no

2    interest in being a class member or being part of the class,

3    that his ability to listen to the evidence is not tainted by

4    the potential for being a participant.  And if the plaintiffs

5    wish to strike, they can exercise a preemptory strike.  But

6    his situation is different than Juror 19 that said he

7    intended to remain in the class.

8           I also think technically there is a missing link in

9    Mr. Simon's logic in that the specific telephone number of

10   Juror 17 is going to drive whether he actually is in the

11   class or not.  And so the fact that he has not taken steps to

12   opt out does not necessarily mean that he is still in the

13   class.

14          So for those reasons we'd ask Your Honor not to

15   strike No. 17 for cause, at least not based on what's been

16   elicited thus far during voir dire.

17          THE COURT:  Well, I understand the logic of both

18   arguments.  My question is if technically he is a member of

19   the class, then he should not remain as a prospective juror.

20   So I'm going to exercise my authority and dismiss Jurors

21   No. 17 and 19.

22          MR. SIMON:  Thank you, Your Honor.

23          (Court in recess from 11:03 a.m. until 11:07 a.m.)

24          (The following proceedings continued within the

25   hearing of open court:)

1      THE COURT:  Please be seated.  It appears that all

2  members are here.  I misspoke earlier on a matter.  The

3  following entities and individuals are not defendants in this

4  case:  Enthuse Entertainment, Eastern Gate, Bob Brewer, and

5  SixDi, Inc.  They are not defendants.

6      Additionally I want to note that two additional

7  attorneys have been brought to my attention that were not

8  mentioned.  And they are Rob Schultz and Ronald Eisenberg.

9  Is there anyone on the panel who knows or believes they might

10  know an attorney Rob Schultz?  Ronald Eisenberg?  Okay.

11  Thank you.

12      Whenever plaintiff is ready.

13      MR. SIMON:  Thank you, Your Honor.  Good morning

14  everybody.  As Your Honor has introduced me, I'm John Simon.

15  And with Kevin and Brian, we represent the plaintiffs in this

16  case, the Golans.  Mr. and Mrs. Golan are the class

17  representatives, and we also represent the class in this

18  case.

19      And we got to hear, you know, a little bit about

20  everybody this morning, right.  And to be fair I want to just

21  tell you real briefly, I'm from St. Louis, born and raised

22  here.  Went to St. Louis U undergrad and law school.  My

23  office is a couple, two blocks away.  This is my 31st year of

24  practice.  I have three children.  And last night at about

25  11:30 I became a grandfather for the first time.  So if you

1    see me dozing off this afternoon, you may know why.

2           So, you know, I thought it was really interesting

3    and wonderful how responsive everybody was this morning to

4    Your Honor's questions.  Everybody comes in with different

5    beliefs, right.  We represent in our community different

6    religions, different political views, right.  And I loved it

7    when I heard His Honor say, "This is your District Court,"

8    right.  It's your District Court.  You are the justice

9    system.

10          So following up from that, ladies and gentlemen,

11   here's what I want to talk about.  Has everybody here heard

12   the phrase, "Nobody is above the law"?  Everybody heard that?

13   Who has heard that?  Go ahead and raise their hand.  Anybody

14   not heard that?  Okay.

15          So what I want to ask is this:  Does everybody here

16   agree that the law as Your Honor is going to give it at the

17   end of this case as His Honor applies to everybody equally?

18   Can everybody agree with that?  Does anybody here not agree

19   with that concept?  Okay.  I don't see any hands.

20          So does everybody agree that the law should apply

21   the same no matter what your political views?  Everybody

22   agree with that?  Okay.

23          Does everybody agree that the law should apply

24   equally to everybody no matter what their station is in life;

25   how old they are, what race they are, whether they've got

1    money, whether they don't have money?  Can everybody agree

2    the law should apply equally to everyone?  Anybody not agree

3    with that?  Okay.

4            As far as applying the law in this case, can

5    everybody agree no one gets a free pass?  Everybody agree

6    with that?  Okay.

7            Now, ladies and gentlemen, I'm not going to spend

8    much time with you, His Honor has gone over everything in

9    good detail.  But I do want to talk to you about a couple

10   issues that I think are very important for you in this case.

11   His Honor read an instruction to you this morning.  It says:

12   "In deciding what the facts are, you have to decide what

13   testimony you believe and what testimony you do not believe.

14   You may believe all of what a witness says or only part of it

15   or none of it."  Everybody remember hearing that instruction

16   from the Court?

17           THE COURT:  Mr. Simon, I think that I skipped that

18   unintentionally, and I'm going to read those instructions

19   now.  I should have done that.

20           MR. SIMON:  I apologize, Your Honor.  I was reading

21   them as you were --

22           THE COURT:  No.

23           MR. SIMON:  In any event, I kind of jumped the gun.

24           THE COURT:  Let me read them now.  I should have

25   read them before.  I think you have been compliant, I haven't

1    heard any telephones go off, so I'm not going to read that

2    first part.  If you are selected as a juror in this case you

3    will have some responsibilities in managing your telephone,

4    and I'll talk a little bit about that more later.

5           I understand you may want to tell your family, close

6    friends and other people about your participation in this

7    trial so you can explain when you are required to be in

8    court.  And you should warn them not to ask you anything

9    about the case, tell you anything they know or think they

10   know about it, or discuss this case in your presence.  You

11   must not post any information on any social network or

12   communicate with anyone about the parties, witnesses,

13   participants, evidence, or anything else related to this

14   case, tell anyone anything about the jury's deliberations in

15   this case until after I accept your verdict or until I give

16   you specific permission to do so.

17          Just a moment.  Actually these instructions are to

18   be read later.  I will let you, Mr. Simon, go ahead and read

19   the instruction or talk about the instruction you mentioned

20   because that will be given later to the jury.  Go ahead.

21          MR. SIMON:  Thank you, Your Honor.  So ladies and

22   gentlemen, you will be instructed by the Court that before

23   you deliberate the case you'll be asked or you'll be told in

24   deciding what the facts are, you may have to decide what

25   testimony you believe and what testimony you don't believe.

1    You'll also be instructed that in deciding what testimony to

2    believe, consider the witness' intelligence, their

3    opportunity to have seen or heard things they testify about,

4    their memories, any reasons they might have to testify a

5    certain way, how they act while they are testifying, and

6    whether they said something different at another time.  Can

7    everybody do that?

8         Let me ask you this:  Does anybody here feel like

9    they are gullible?  Anybody feel that way?  Okay.

10        Does everybody here feel like they are up to the

11   task of listening to the witness on the stand, hearing what

12   they may have said before, and making a determination as to

13   whether or not that testimony is credible?  Everybody here

14   feel that they can do that?  Okay.  Anybody think they are

15   unable to do that?

16        You're also going to be instructed by the Court to

17   consider whether the testimony is generally reasonable.  Can

18   everybody do that?  Okay.  Anybody think that they have some

19   problem doing that?  I don't see any hands.  You'll also be

20   instructed to consider how consistent their testimony is with

21   other evidence that you believe.  Does anybody here feel like

22   they'd have trouble doing that?  Okay.  I don't see any

23   hands.

24        Ladies and gentlemen, you all took an oath this

25   morning, right, in this courtroom?  You raised your right

1    hand and you took a solemn oath to tell the truth in

2    answering the Court's questions, correct?  Everybody believe

3    in the sanctity of that oath?  Anybody not believe in that?

4         Does everybody here expect witnesses -- or forget

5    about witnesses for now.  Does everybody here generally

6    believe people should be truthful in their everyday

7    transactions?  Everybody believe that's a good thing, to be

8    truthful and honest?  Okay.  Do you expect that?  Does

9    everybody expect the person you're dealing with to be

10   straightforward and honest?  Okay.

11        THE COURT:  Mr. Simon, about an arm's length from

12   the podium.

13        MR. SIMON:  Yes, Your Honor, I'm sorry, Your Honor.

14        Now, you also heard, ladies and gentlemen, about

15   Governor Huckabee, Mike Huckabee.  And I think you were asked

16   if anybody knew him.  Who here has heard of him?  Okay.  Most

17   everybody has heard of him.  Governor Huckabee may be a

18   witness in this case.

19        Let me ask this:  You know, he was the governor of

20   Arkansas for awhile.  I think he ran for President in '08 and

21   '16, he was candidate for the President of the United States.

22   He had a show, a talk show and a radio show.  Does anybody

23   here -- has anybody here listened to Governor Huckabee's talk

24   show or his radio show?  Okay.  All right.  And you are Juror

25   No. 29, correct?

1          VENIREPERSON NO. 29:  Yes.

2          MR. SIMON:  Can you tell me a little more about

3     that?  How often did you listen?  Is it a regular thing?

4          VENIREPERSON NO. 29:  I listened.  I watched his

5     talk show, where they play their music and stuff.  I watch

6     that on a regular basis.  I can't say I saw every episode.

7          MR. SIMON:  You were a regular follower, right.

8          VENIREPERSON NO. 29:  And I have read his book, one

9     of his books.

10         MR. SIMON:  So let me ask you this.  And I

11    apologize, I've got -- you're Ms. Carruthers?

12         VENIREPERSON NO. 29:  Yes.

13         THE COURT:  You know, knowing that, you listened to

14    him, you hold a high opinion of him?

15         VENIREPERSON NO. 29:  Yes.

16         MR. SIMON:  Do you think if he came in to testify,

17    even before he got on the stand you'd lean a little bit

18    toward believing him?

19         VENIREPERSON NO. 29:  Yes.

20         MR. SIMON:  Just a little bit.  So if the defendants

21    call him, we'd be starting out a little bit behind with

22    regard to Governor Huckabee, right?

23         VENIREPERSON NO. 29:  You probably would.

24         MR. SIMON:  Thank you for your honesty.  Thank you.

25    Does anybody -- and I assume you have a favorable opinion of

1    Governor Huckabee, correct?

2              VENIREPERSON NO. 29:  So far.

3              MR. SIMON:  Good answer.  Very good answer.  So does

4    anybody else here have an opinion of Governor Huckabee either

5    favorable or unfavorable?  Let's start with favorable like

6    Ms. Carruthers.  Okay.  And Juror No. 21.  And you are

7    Mr. Tedder?

8              VENIREPERSON NO. 21:  Tedder.

9              MR. SIMON:  Tell us about that, please.

10             VENIREPERSON NO. 21:  Twenty-one.  More likely to

11   watch him on Fox News is what my exposure would be.  But I do

12   admire him.  I do feel like he's as honest as a politician

13   can be.  I'm not sure what that means but --

14             MR. SIMON:  All right.  So let me ask you this, the

15   same thing as with Ms. Carruthers.  If the defendants choose

16   to bring Governor Huckabee in to testify on their behalf,

17   based on your impression, your feelings toward Governor

18   Huckabee, do you think we might be starting out a little bit

19   behind?

20             VENIREPERSON NO. 21:  Yes, sir.

21             MR. SIMON:  Thank you very much.  Appreciate your

22   honesty.

23             Anybody else here hold a favorable opinion of

24   Governor Huckabee?  Okay.  Now let's go with the opposite

25   side, anybody here hold an unfavorable opinion of Governor

1   Huckabee?

2          VENIREPERSON NO. 16:  I'm just going to be honest,

3   I'm Juror 16.  My hormones are crazy, so I feel very rageful

4   toward certain politicians, and I can't control it.

5          THE COURT:  What's your number?

6          VENIREPERSON NO. 16:  Sixteen.  So I just want to

7   let you know that.

8          MR. SIMON:  Okay.

9          VENIREPERSON NO. 16:  So I'm probably not -- I'm

10  too -- I have no control.

11         MR. SIMON:  Okay.  And so they would be starting out

12  a little behind, is that what you're telling us?

13         VENIREPERSON NO. 16:  I don't even follow Mike

14  Huckabee or whatever his name is, but I just know I don't

15  like him because he's on Fox News.  So I'm just telling you,

16  this is just how I am right now.

17         MR. SIMON:  I appreciate that.  Thank you very much.

18  Anybody else?  Okay.  And let's see, it's Juror No. 6.  And

19  Juror No. 6, you're Ms. Rice, correct?

20         VENIREPERSON NO. 6:  Yes.

21         MR. SIMON:  Okay.  And tell us about that, please.

22         VENIREPERSON NO. 6:  Just different views, I'm more

23  liberal.

24         THE COURT:  Again, I'm having trouble hearing you.

25         VENIREPERSON NO. 6:  Just different views.  I am

1    more of a liberal, so it's -- I just don't agree with his

2    views on certain things.

3           MR. SIMON:  Okay.  But that's political views,

4    correct?

5           VENIREPERSON NO. 6:  Correct.

6           MR. SIMON:  Do you have an opinion on his

7    credibility or honesty before you start out the case, before

8    you listen to his testimony?

9           VENIREPERSON NO. 6:  I don't think so.

10          MR. SIMON:  Thank you.  And Juror No. 7, it's

11   Mr. Amen?

12          VENIREPERSON NO. 7:  Amen.  Well, I don't know if

13   this case involves Mr. Huckabee's religious beliefs.  I do

14   have a son who is gay and is going to be married next month.

15   I am a Christian and I am conservative, but I don't know if

16   this religious is going to be coming up in this case or not.

17          MR. SIMON:  And I appreciate that.  I can't comment

18   on the evidence at this point.  But the same question as with

19   Juror No. 6, you haven't formulated an opinion about his

20   credibility, is that fair to say?

21          VENIREPERSON NO. 7:  Right.  I don't know that much

22   about him.

23          MR. SIMON:  All right.  Good enough.  Thanks very

24   much.  Anybody else?  Okay.  I don't see any hands.  I'm

25   sorry, who did I miss?  Yes, Juror No. 25.

1          VENIREPERSON NO. 25:  Once again I'm a scientist, so

2     I don't have a favorable opinion of --

3          THE COURT:  I can't hear you.

4          VENIREPERSON NO. 25:  I'm a scientist so I don't

5     have favorable opinions of those with strong religious views.

6          MR. SIMON:  And, Mr. Baugh, in terms -- specifically

7     in terms of his credibility, have you formulated an opinion

8     in terms of whether he's going to tell the truth or not

9     before he gets on the stand?

10          VENIREPERSON NO. 25:  No, I don't.

11          MR. SIMON:  You haven't formulated an opinion about

12     that one way or the other; is that correct?

13          VENIREPERSON NO. 25:  No.

14          MR. SIMON:  Okay.  Thank you.  Anybody else?  Now,

15     let me ask this, and I don't want to get in trouble, okay.

16     I've been practicing 31 years and my job is to question

17     witnesses as is these other attorneys here, that's what we

18     do.  If a witness gets on this stand and says something

19     different than what they said before, is everybody okay with

20     me questioning him about that?  You know, maybe asking some

21     tough questions?  Is everybody okay with that?  Is anybody

22     not okay with that?  Is anybody put off by that?  Okay.

23     Thank you.

24          Does everybody here agree with this statement:

25     Everybody individually should be responsible for their own

1    conduct.  Everybody agree with that concept?  Anybody have

2    any problem with that or disagree with that?  Thank you.

3           Ladies and gentlemen, those are all the questions I

4    have.  Thank you very much.

5           THE COURT:  Counsel.

6           MR. LUDWIG:  Good morning.  My name is Fredrick

7    Ludwig, and like John, I was born in St. Louis.  I'm one of

8    seven children.  I know there's somebody on the panel that

9    had seven children, and I just remember thinking whew.  I've

10   been married for a long time.  I have four children myself,

11   so I don't have much time for hobbies either.

12          The defendants are each going to get a chance to get

13   up here so we have limited time so I'm going to jump right

14   in.  The way I always explain voir dire is if the issue in

15   the trial is what's better, chicken or beef, and you're a

16   cattle rancher, you're probably not the person we want on the

17   jury.  And I think everybody understands that.  So we ask

18   questions to kind of make sure that there are no biases.

19          But I do have a question procedurally.  During this

20   case the plaintiffs get to call witnesses first, so they get

21   to put on evidence first.  And in the course of their

22   examination of witnesses the defendants will then have a

23   chance to stand up and cross-examine those witnesses and do

24   direct examination of those witness.  That puts me in the

25   position of depending on who the plaintiffs call, when they

1    close their case, I may not have any witnesses to call

2    because I may have examined all the witnesses that I wished

3    to examine during the plaintiffs' case.

4         And I want to know is there anybody on the panel who

5    is going to hold that against me simply because I don't call

6    any witnesses?  I can't promise that's not going to happen

7    because I don't know who they will call.  Is there anybody on

8    the panel that will hold that against me if I don't call any

9    witnesses?  And my client is a gentleman named Steve Griffin

10   who is sitting over there, and his company is Veritas

11   Marketing Group, LLC.  And the Judge asked you some questions

12   about that earlier.

13        The Judge asked some questions about robocalls

14   earlier.  Is there anybody on the panel who would just be

15   delighted to see that people that sponsor automated telephone

16   calls are sued?  No one?  Okay.

17        If the evidence in this case shows that there were

18   3.2 million or 4 million automated telephone calls that were

19   made, is that number just so outrageous to anyone on this

20   panel that they are going to have a hard time being fair?

21        I think those are the only questions that I'm going

22   to ask so that the other defendants have a chance to ask you

23   questions.  Thank you.

24        THE COURT:  Thank you, Mr. Ludwig.

25        MS. YOUNG:  Hello everyone.  Are we having a good

1    morning yet?  My name is Teresa Young.  I am actually unlike

2    these guys, not originally from St. Louis.  I am actually

3    originally from Kansas City, moved here for law school and

4    ended up staying because it was, as everybody told us, a

5    great place to raise kids.  I do have one daughter, she is

6    now off to college, because where she's going I probably

7    shouldn't tell you, but she is a KU student.  I would like to

8    apologize to all the Missouri people, and particularly the

9    gentleman who is wearing a Mizzou shirt.  And unfortunately

10   she likes it too, I'll tell you that.  I've been practicing

11   for 16 years at a law firm down here in St. Louis, Brown &

12   James, which we talked about earlier.

13        Again, we don't have a lot of time on our side and I

14   don't want to take a lot of your time this morning so I'm

15   going to go ahead and jump into some questions.  Again, like

16   Mr. Ludwig was just talking about, it could be that all of

17   the witnesses that I would plan to call in this case are

18   going to come up in the plaintiffs' case in such a way I

19   don't need to call any witnesses either at the conclusion of

20   my case.  Is that going to bother anybody?  Seeing no hands.

21   Okay.

22        Now, can I get just a show of hands of people who

23   have actually received an automated call or what's been

24   termed today as a robocall before?  And of the people that

25   just raised your hands, did that bother anybody?

1          Okay.  I'm going to go through very quickly,

2   starting over here, it looks like Juror No. 1.  Is it

3   Ms. Ortyl?

4          VENIREPERSON NO. 1:  Ortyl.

5          MS. YOUNG:  And what kind of a robocall did you

6   receive?

7          VENIREPERSON NO. 1:  Obviously I didn't listen to it

8   very long, I just hang up five seconds after realizing what

9   it is.

10          MS. YOUNG:  Okay.  So you just hang up very quickly.

11   And is that something that really irritates you when it

12   happens?

13          VENIREPERSON NO. 1:  Yeah, it's annoying.

14          MS. YOUNG:  And I think Juror No. 2.

15          VENIREPERSON NO. 2:  Two, yes.

16          MS. YOUNG:  So you've received robocalls before?

17          VENIREPERSON NO. 2:  Yes.

18          MS. YOUNG:  And has it been on a frequent basis?

19          VENIREPERSON NO. 2:  It seems like today is my day,

20   I get six or eight in one day, and I might go a few days, and

21   it's like they pull my name today is my special day.  They

22   call at dinnertime or even at eight o'clock at night and that

23   kind of thing.

24          MS. YOUNG:  And it bothers you when they call you

25   that late at night?

1          VENIREPERSON NO. 2:  Yeah, I don't want to be

2     bothered.

3          MS. YOUNG:  Okay.  Here on the front row, No. 3.

4          VENIREPERSON NO. 3:  Juror No. 3.  Same way as Juror

5     No. 1, when it's automated I hang up.  I don't even listen to

6     what they say.

7          MS. YOUNG:  Okay.

8          VENIREPERSON NO. 4:  No. 4, it was pretty much the

9     same thing.  I hang up right away.  And if I was fixing

10    supper, I would leave it off the hook.

11         MS. YOUNG:  Do you get so many calls that you

12    regularly leave the phone off the hook during dinner?

13         VENIREPERSON NO. 4:  No.

14         MS. YOUNG:  And let me ask this front row then, of

15    all of the people who said yes, is that something that -- in

16    this case we are going to be talking about robocalls that

17    were made.  Is that going to like Mr. Simon was saying start

18    us kind of behind the eight ball on the defense side as far

19    as you're concerned?  Juror No. 3.

20         VENIREPERSON NO. 3:  Yes.

21         THE COURT:  You'll have to answer individually.

22         MS. YOUNG:  Right.  Okay.  So Juror No. 3, you said

23    that you think that's something where we would actually start

24    behind the eight ball, you'll be inclined to disagree with

25    using robocalls?

1          VENIREPERSON NO. 3:  Uh-huh.

2          MS. YOUNG:  Is that a yes?

3          VENIREPERSON NO. 3:  Yes.

4          MS. YOUNG:  And is that something where you think

5    you would not be able to fairly or impartially hear the

6    witness testimony that's going to come in and decide the case

7    based on that because you would have this inclination to

8    believe that the plaintiffs should not have been called with

9    a robocall?

10         VENIREPERSON NO. 3:  It just depends on the

11   reasoning why they are calling or how many times if they say

12   no, stop, and they don't stop, then I think I would be -- it

13   would be negative.

14         MS. YOUNG:  Okay.  And I guess, No. 1, how about

15   you, I saw you shaking your head.  Would we also start behind

16   the eight ball with you?

17         VENIREPERSON NO. 1:  Yeah.

18         MS. YOUNG:  And Juror No. 2, I saw you shaking your

19   head as well.

20         VENIREPERSON NO. 2:  Yeah, most of the time I just

21   ignore them too, but sometimes I've had a few even rude ones

22   even when I tried to tell them to ask me to take them off the

23   calling list, I've had them call me back a half hour later

24   and that sort of thing.

25         MS. YOUNG:  And, No. 4, how about you?

1          VENIREPERSON NO. 4:  Four.  I don't think so.  But I

2    would keep in mind what No. 3 said.

3          THE COURT:  I can't hear you.

4          VENIREPERSON NO. 4:  Four.  I would agree with No. 3

5    as far as depending on what the topic was of how long.  If

6    they are rude, you hang up.  I mean, that's just rude.  And

7    if it's something I want to hear about, I may listen to it,

8    but I don't think it will affect me.

9          MS. YOUNG:  And how about in the second row I saw

10   some hands, No. 6.

11         VENIREPERSON NO. 6:  Yeah, I remember getting a lot,

12   especially during political season.  So now I don't get them

13   as much, just a few and far between.  But since I was

14   supposed to be on the "do not call" list, it was kind of

15   aggravating, irritating.  They would be on the voicemail if

16   it was during work and then they would be after work we would

17   get them.  So it's kind of annoying.

18         MS. YOUNG:  And the same question to you that I've

19   asked before, would that then, would we start behind the

20   eight ball as far as the defense goes in talking about these

21   robocalls?

22         VENIREPERSON NO. 6:  I mean, I kind of agreed what

23   they said, it just kind of depends on the whole situation,

24   the reason behind the call, how often the calls.

25         MS. YOUNG:  And Juror No. 10.

1          VENIREPERSON NO. 10:  Yeah, we get the calls.  And,

2    you know, we're almost threatening to pull our landline out

3    to eliminate those calls.  I have to admit, I don't think

4    I've gotten a call that I've gotten out that I wanted to

5    hear.  Saying all that, I think hopefully I could still come

6    in and listen to the details and still have an unbiased

7    opinion.

8          MS. YOUNG:  Anybody else on the second row?  Did I

9    miss anybody?  No. 8.

10         JUROR NO. 8:  Yeah, but I take full responsibility

11   for not putting myself on the "no call" list.  And it is a

12   free America, these people are trying to do business.  Is it

13   annoying?  Yeah, I'm not going to lie, but it's not going to

14   make me change my decision.  I get paid as an intelligence

15   analyst to listen to all kind of evidence and that's what

16   we're here for.

17         MS. YOUNG:  Sounds good.

18         VENIREPERSON NO. 9:  I get them too, not very often.

19   I just hang up and forget about it five seconds after I hang

20   up, so it doesn't really bother me.

21         MS. YOUNG:  Sounds good.  And in the third row,

22   No. 16.

23         VENIREPERSON NO. 16:  Yeah, but I don't listen to

24   them.

25         MS. YOUNG:  Okay.

1          THE COURT:  I didn't hear you.

2          VENIREPERSON NO. 16:  I don't listen to them, I just

3    hang up.

4          MS. YOUNG:  And is that something that really

5    bothers you when they call you?

6          VENIREPERSON NO. 16:  Well, I'm on call for work

7    24/7, so when I get this type of a call and I have a free

8    minute, it just depends what kind of mood I'm in.

9          MS. YOUNG:  I know you feel rage right now.

10         VENIREPERSON NO. 16:  Thinking about it now it makes

11   me mad but it just depends on whatever.

12         MS. YOUNG:  Okay.  And did I see No. 15?

13         VENIREPERSON NO. 15:  Yeah, I've gotten them

14   regularly in the past.  I'm on the "do not call" list.  I use

15   my cell phone for business.  We do not have a home phone.  So

16   that's the only part that I don't like because my number is

17   public so using my phone number for business, and then I have

18   to answer the call and it's something like that.

19         MS. YOUNG:  So it's irritating?

20         VENIREPERSON NO. 15:  It can be.

21         MR. SIMON:  But is that something where you feel

22   like it would put us behind the eight ball coming in today?

23         VENIREPERSON NO. 15:  I don't think so.  I mean,

24   it's irritating to me specifically because it's my work phone

25   number.  I know why it's there for advertising.  I mean, we

1   advertise by phone also in my business.  I just -- to me

2   specifically in my business having my number out there and

3   getting phone calls from clients, it's just not something

4   that works for me.

5           MS. YOUNG:  Sure.  No. 14.

6           VENIREPERSON NO. 14:  So the most annoying robocall

7   I received was recently where I answered and someone said,

8   "Hello, I can't hear you."  And she giggled.  I said,

9   "Hello?"  She said, "It seems like I had a problem with my

10  mouthpiece."  And it turned out to be a robocall.  So that

11  kind of like that manipulation was really annoying.

12          MS. YOUNG:  And so what about generally, generally

13  do you think you would have a problem coming in and listening

14  to evidence about robocalls?

15          VENIREPERSON NO. 14:  Yeah, it depends on the nature

16  of the call and like is it something like that?  So if it's

17  something what I experience where they are being crafty with

18  that versus like I don't know, so it depends.

19          MS. YOUNG:  And No. 13.

20          VENIREPERSON NO. 13:  I pretty much get a robocall

21  about once a day for some off reason.  And the usual is your

22  number has been randomly selected, you're going on an all

23  expenses paid trip or hotel.  I avoid it, but it's pretty

24  annoying.

25          MS. YOUNG:  So you think it's annoying.  Is it

1    something where you just really hate robocalls?

2              VENIREPERSON NO. 13:  Yes.

3              VENIREPERSON NO. 12:  I also received them and I

4    don't care for them.  Who does.  But I think I can be

5    impartial, but it also depends on the circumstances of what

6    is going on.

7              MS. YOUNG:  And did I see your hand go up, No. 11?

8              VENIREPERSON NO. 11:  Yes, ma'am.  I've received

9    them from time to time, but I don't pay much attention to

10   them.  And a lot of times if I look and I don't know the

11   number I just don't answer the phone, so I don't waste my

12   time.

13             MS. YOUNG:  Got you.  Okay.  And then over here on

14   the first center bench.

15             VENIREPERSON NO. 18:  I raised my hand.  I received

16   them as well.

17             THE COURT:  I'm sorry, it's a long way back there

18   and the court reporter has to get everything.  Can you speak

19   up a little bit?

20             VENIREPERSON NO. 18:  I just have been frustrated by

21   them and usually ignore on the caller ID.  I frustrate myself

22   for answering sometimes.

23             MS. YOUNG:  And No. 21.

24             VENIREPERSON NO. 21:  Twenty-one.  I don't seem to

25   receive as many as I used to.  One a year is too many.  I

1  really dislike the calls.

2          MS. YOUNG:  And how about No. 22?

3          VENIREPERSON NO. 22:  I don't receive them often and

4  they are okay.  They wouldn't have an affect one way or

5  another on this situation.

6          MS. YOUNG:  Twenty-three.

7          VENIREPERSON NO. 23:  It is kind archaic,

8  bothersome.  I think I can separate my personal opinion from

9  the situation.

10          MS. YOUNG:  Twenty-four.

11          VENIREPERSON NO. 24:  I receive them occasionally

12  like everyone does, but most of the time I ignore them.  I

13  don't think they would affect me.

14          MS. YOUNG:  And then how about over to the bench

15  over here on my right, No. 25?

16          VENIREPERSON NO. 25:  Yeah, I receive a lot of them

17  but they don't bother me because I have my phone on do not

18  disturb.  So they don't disturb me.  I suggest everybody do

19  that.  Unless someone is on your contact list, your phone

20  doesn't ring.  And that's what bothers me is the phone

21  ringing.  I'm in the middle of something and the one rings.

22  So I have do not disturb, so robocall calls go to the

23  answering machine.  And they don't put anything on the

24  answering machine so it doesn't bother me.  But I do get a

25  lot of them.  If someone is on your contact list it rings.

1    So like I said, it doesn't bother me.  I don't even hear

2    them.

3             MS. YOUNG:  And then No. 26.

4             VENIREPERSON NO. 26:  I think I remember some

5    robocalls to parents when school has been canceled or

6    whatever reason.  I'm from Wisconsin, snow days, so I think

7    those are okay.  I receive some that I won the lottery and

8    win a trip and that's annoying and kind of predatory.  And

9    for political reasons I think I was taking a survey once and

10   I chose to do that, but other times I'll hang up if I'm not

11   in the mood or driving or something.

12            MS. YOUNG:  Okay.

13            VENIREPERSON NO. 27:  Twenty-seven.  So, yes, I

14   receive them.  Yes, I find them irritating.  That's what

15   somebody else said.  I don't answer the call if I don't

16   recognize the number, but I don't think it would bias me.

17            MS. YOUNG:  Okay.

18            VENIREPERSON NO. 28:  No. 28.  We used to get

19   robocalls and then we got rid of our landline, so I don't get

20   that many on my cell phone.  And when I do it's annoying but

21   most of the time I don't answer because I don't recognize the

22   number.

23            MS. YOUNG:  Okay.

24            VENIREPERSON NO. 25:  Can I add one thing?  I don't

25   have a landline, I got rid of the landline years ago.

1          VENIREPERSON NO. 29:  I don't have a landline so I

2     get very few.  If I don't know the number, I don't answer.

3     If they leave a message, I love the delete key.

4          MS. YOUNG:  And actually one juror, No. 25, brought

5     up one issue I want to raise with everybody, which is in this

6     case you're going to hear that a robocall actually left a

7     message on a machine.  Does anybody have a problem with that?

8     That is particularly annoying if a robocall comes in and a

9     message is left on your voicemail?  No. 13.

10          VENIREPERSON NO. 13:  Yes.

11          MS. YOUNG:  That's something that would really annoy

12     you?

13          VENIREPERSON NO. 13:  (Nodding.)

14          MS. YOUNG:  Okay.  Did I miss any other show of

15     hands?  Okay.  Now, my client, Gabe Joseph, owned a company

16     who actually put out robocalls, so he's actually the ones who

17     own the dialers and make telephone calls.  Is there anybody

18     who is going to have difficulty believing Mr. Joseph's

19     testimony when he gets up and he talks on the stand based on

20     the fact that he made his living by making robocalls?

21     Showing no hands.

22          So if I could get a show of hands who all thinks

23     that robocalls should be banned outright?  Okay.  Start back

24     here.  No. 1.  Is that right?

25          VENIREPERSON NO. 1:  Yes.

1          MS. YOUNG:  Think they should be banned altogether?

2          VENIREPERSON NO. 1:  I just don't see the point.

3          MS. YOUNG:  No. 2, did I see your hand?

4          VENIREPERSON NO. 2:  I can count eight and ten phone

5     calls a day.  It gets very annoying if they hang up or don't

6     answer.

7          MS. YOUNG:  Was there anybody in the first row?  And

8     how about the second row, No. 10 and No. 7.  So No. 10,

9     you're ready to get rid of them altogether?

10         VENIREPERSON NO. 10:  Yes.

11         MS. YOUNG:  And No. 7, same thing?

12         VENIREPERSON NO. 7:  Uh-huh.

13         MS. YOUNG:  That everybody in the second row?  How

14    about the third row?  No. 16.

15         THE COURT:  I'm getting behind.  What number?

16         MS. YOUNG:  No. 16, Your Honor.  And same thing,

17    ready to get rid of them?

18         VENIREPERSON NO. 16:  I know a lot of people get

19    ripped off, I think they are horrible.

20         MS. YOUNG:  And so No. 13 I see also.

21         VENIREPERSON NO. 12:  Twelve.

22         MS. YOUNG:  Start with 12.

23         VENIREPERSON NO. 12:  Twelve.

24         MS. YOUNG:  You ready to get rid of them?

25         VENIREPERSON NO. 12:  Yeah.

1          MS. YOUNG:  And how about No. 13?

2          VENIREPERSON NO. 13:  Yes.

3          MS. YOUNG:  Did I get everybody in the jury box?

4   And I'm going to move again to the center aisle over here.

5   And did anybody raise their hand for that?  No. 21.

6          VENIREPERSON NO. 21:  Ban them.

7          MS. YOUNG:  Anybody else in that center aisle?

8   Okay.  How about over here on the right?  Nope.  Okay.

9          So on that same thing, does anybody think that a

10  class action lawsuit is a good way to get rid of robocalls?

11  Nobody.  No. 16.

12         VENIREPERSON NO. 16:  Yeah, because you want them

13  banned, so why would I raise my hand if I didn't think that

14  was a good idea, right?  Right?

15         MS. YOUNG:  So anybody else?  Anybody else think

16  it's a good idea using class actions in order to get rid of

17  robocalls?  No. 14.

18         VENIREPERSON NO. 14:  I didn't raise my hand for

19  saying they should be banned entirely, but I do think that is

20  an effective method like so --

21         MS. YOUNG:  Okay.  Was there anybody over on there

22  that raised their hand?  Okay.

23         Okay.  Can I just get a show of hands on this, who

24  all was using a landline back in 2012?  I've got two, five,

25  No. 10, and No. 6.  And in the back row, No. 14.  And then

1    over here I've got No. 18, 22, No. 27.  And of the people who

2    just answered that or I guess otherwise, who actually has a

3    landline as of today?  No. 2, No. 5, No. 6, and No. 10.

4           VENIREPERSON NO. 16:  We kind of do.  We don't have

5    a land phone.

6           MS. YOUNG:  Okay.  So it's not something where it's

7    like hooked up to the Internet or something?

8           VENIREPERSON NO. 16:  Yes.  Did I miss anybody else

9    in the third row?  How about landlines today?  18, 22, and

10    over here 27.

11           Those are all of the questions that I have for you

12    today.  I'm going to go ahead and turn you over to another

13    one of the defense attorneys.  Thank you for your time and

14    your patience.

15           MR. McLAUGHLIN:  Good morning everyone.  My name is

16    Pat McLaughlin.  I'm an attorney with the firm Spencer Fane

17    Britt & Browne here in St. Louis.  My colleague Eric Block is

18    at counsel table, and I introduced him earlier.  I represent

19    Courage 2012, LLC, one of the defendants in this case.  Their

20    corporate representatives Tim Lyles and Todd Thetford are

21    also seated at the table along with our paralegal Melanie

22    Cummins.

23           And as I said our client is a limited liability

24    company.  In fact, it's a Texas limited liability company.

25    I'm going to ask a few brief questions, so I won't take much

1    of your time today.  So that's a corporate entity, a limited

2    liability company.

3            Does anyone think that there's something inherently

4    wrong about people forming a corporate entity such as an LLC

5    or any other type of entity to do business?  Does anyone

6    think there's anything inherently wrong with that?  I didn't

7    see any hands.

8            So who thinks that maybe even just a little bit the

9    creation of an LLC or another type of business entity is to

10   allow business people to do bad things and get away with it?

11   Does anyone think that?

12           Mr. Simon I think addressed this a little bit but

13   the law treats companies like people.  He said everyone is

14   equal under the law.  Is there anyone here that thinks they

15   might have a hard time treating a company as a person when

16   you hear evidence in this case?  Anyone think they might have

17   a hard time with that?

18           Is there anyone here who thinks they might have a

19   hard time drawing a distinction between a limited liability

20   company and the people who own the company?  Does anyone

21   think that might be hard?

22           Does anyone have any experience, positive or

23   negative, dealing with a limited liability company in your

24   personal or business life?  Juror No. 10.

25           VENIREPERSON NO. 10:  No. 10, my son and I have an

1    LLC.

2         MR. McLAUGHLIN:  Okay.

3         VENIREPERSON NO. 10:  Maybe it's not limited, my

4    sister and my brothers, kids have a limited partnership for a

5    family farm.

6         MR. McLAUGHLIN:  So when you say you have an LLC,

7    are you a member?

8         VENIREPERSON NO. 10:  Yeah, my son and I.  I'm the

9    CEO and he's the chief engineer.

10        MR. McLAUGHLIN:  And generally can you explain why

11   you did that?

12        VENIREPERSON NO. 10:  Well, the rules for obtaining

13   a suppresser for a firearm is different -- was different for

14   an LLC versus a private individual.  We took the opportunity

15   to form the LLC to use those differences and also to form the

16   LLC because we have a machine shop where we're making parts.

17        MR. McLAUGHLIN:  So there was a lot involved in that

18   decision?

19        VENIREPERSON NO. 10:  Yeah.

20        MR. McLAUGHLIN:  And did you have an attorney help

21   you with that process?

22        VENIREPERSON NO. 10:  Yes.

23        MR. McLAUGHLIN:  So does anyone think there's

24   anything wrong with having an attorney set up a business

25   entity for you such as an LLC?  Does anyone think that's

1    suspicious or inherently wrong with that?  Did anyone else

2    have any experience positive or negative with a limited

3    liability company?  Yes, ma'am.

4         VENIREPERSON NO. 14:  No. 14.  I do freelance work

5    and so sometimes people who pay me are LLCs.  I also have a

6    family member who recently set up her own law firm and it's

7    an LLC.

8         THE COURT:  I'm really having trouble hearing you.

9         VENIREPERSON NO. 14:  Sorry.  Did you hear the first

10   part?  I'm a freelancer so my payments come from LLC

11   companies, and then also I have a family member who set up an

12   LLC law firm.

13        MR. McLAUGHLIN:  Is there anything about that

14   experience that might make it difficult for you to hear

15   evidence and weigh the evidence in this case with respect to

16   my client, which is an LLC?

17        VENIREPERSON NO. 14:  No, I don't think so.

18        MR. McLAUGHLIN:  Thank you.  That's all I have.

19        MR. SCHWALB:  For a few more minutes, good morning.

20   I'm the last so we're close to a lunch break.  Thank you for

21   your patience.  My name is Brian Schwalb.  Unlike the other

22   lawyers who introduced themselves to you, I'm not from St.

23   Louis, I'm not from Missouri.  I live and work in Washington

24   D.C. as my colleagues from Venable.  And I represent

25   Dr. Leininger who lives in San Antonio.

1          Sometimes in Washington we wish we had the common

2    sense of the Midwest, we miss a little bit of that in

3    Washington.  We've certainly had plenty of hospitality and

4    have been treated as if we're part of the neighborhood being

5    there.

6          But I have to ask this:  Is there anybody who thinks

7    that they might have a hard time, that we may start a little

8    bit behind the ball because we don't live and work here in

9    St. Louis, we work and live either in San Antonio or in

10   Washington D.C.?  Anybody have any concern about that?  Okay.

11   Thank you.

12         Quickly since everybody has done a quick bio, I live

13   in Washington.  I have three daughters.  And I often say that

14   if you can deal with three teenage daughters, you can deal

15   with commercial litigation in federal court.  So I get a

16   little bit of good home training on that.

17         I want to talk to you about a couple of issues that

18   I think might be important in the case in figuring out how we

19   can have the fairest jury to resolve the dispute.  And there

20   are no right or wrong answers to my questions, I just hope

21   that you'll jump in like you have with the Court's questions

22   and other counsel's questions and tell me what's on your

23   mind.  No right, no wrong, but I do want to hear from you.

24         When I grew up I heard of a Golden Rule being "You

25   treat others as you would like to be treated."  "Do unto

1    others as you would like them to do unto you."  But there's

2    another saying about the Golden Rule, which is, "He who has

3    the gold makes the rules."  Has anybody heard that twist on

4    the Golden Rule, "He who has the gold has makes the rules"?

5    If you've heard that, would you raise your hand.

6         How many people believe that, that if you have the

7    money in a deal, if you're the investor in the deal, whoever

8    has the money to bankroll a deal, that regardless of what the

9    documents might say, that the contracts might say, the person

10   with the money is making the rules?  Who believes that?  Put

11   your hands up high so I can see you.  Okay.  Let's start with

12   you, Juror 6.  Tell me what you think about that.

13        VENIREPERSON NO. 6:  I just feel that that can be

14   the case.  If you have the money, you kind of have the

15   control to get things to go how you would like them to go.

16   It's not always -- it's not always the case, but it could be

17   done.

18        MR. SCHWALB:  Does anybody else feel that same way?

19   Okay.  Juror No. 11, then we'll go to Juror No. 1.  Sir, tell

20   me what you think about that.

21        VENIREPERSON NO. 11:  Well, I think money talks in a

22   lot of situations.

23        MR. SCHWALB:  Can you tell me a little bit more what

24   you mean?

25        VENIREPERSON NO. 11:  Did you watch the O.J. trial?

1          THE COURT:  I didn't hear you.

2          VENIREPERSON NO. 11:  I asked him if he watched the

3     O.J. Simpson trial.

4          MR. SCHWALB:  Okay.  Juror No. 1, tell me what you

5     think about that.

6          VENIREPERSON NO. 1:  I think it's not always the

7     case, but most times people who have more money or higher

8     privilege tend to make situations go away or make them go the

9     way they want.

10         MR. SCHWALB:  Anybody else feel the same way about

11    that?  Juror No. 3, tell me what you think about that.

12         VENIREPERSON NO. 3:  I believe the saying "Money

13    talks," so even nonprofits still needs money to help them, so

14    I believe that.

15         MR. SCHWALB:  Thank you.  Anybody else who I haven't

16    asked?  Juror 16, yes, tell me what you think.

17         VENIREPERSON NO. 16:  I just think money is power,

18    and if you have a lot of it you get better attorneys, you can

19    buy the other person out.  I mean, there's just -- you just

20    have more leverage.

21         MR. SCHWALB:  I saw a couple of hands when I asked

22    about the Golden Rule.  Juror 21, tell me what you think.

23         VENIREPERSON NO. 21:  I would say that money is not

24    the root of all evil, the love of money is the root of all

25    evil.  It corrupts everyone.

1          MR. SCHWALB:  The love of money corrupts?

2          VENIREPERSON NO. 21:  Yes.  And if you got a lot of

3     it you're more corrupt.

4          MR. SCHWALB:  Okay.  Anybody else feel the same way,

5     that money is -- money corrupts and that people who have

6     money or a lot of money are probably corrupt?  Anybody feel

7     that way?

8          Okay.  Let's talk a little bit more about the Golden

9     Rule.  I think Juror 22, you raised your hand when I asked if

10    you had heard of that saying that "He who has the gold makes

11    the rule," it's a deviation on the Golden Rule.  Tell me, do

12    you think that's true?

13         VENIREPERSON NO. 22:  I think that sometimes people

14    who have more may have more confidence so they go after more,

15    they pursue things a little bit more.  Certainly if you have

16    more money sometimes you can negotiate.  I don't think that

17    every time the person who has the most money is going to win.

18    I don't believe that.  I just don't believe -- there's too

19    many instances where people have not, like the lady from

20    McDonald's who sued for the coffee and she won a whole lot of

21    money in the suit against McDonald's, and I thought that was

22    an interesting thing.  But normally if you have money you

23    can -- if you have money, you make the rules, I don't believe

24    that.

25         MR. SCHWALB:  On this side I think I saw a couple

1    hands, Juror 25 and 26.

2         VENIREPERSON NO. 25:  I've had some experience

3    professionally when people have enormous amounts of money

4    and, yeah, they can make the rules, or try to.

5         MR. SCHWALB:  Okay.  Juror 26.

6         VENIREPERSON NO. 26:  I don't know about -- well, I

7    think it may influence the rules.  And I think this podcast I

8    was listening to about tax base in California.  It had tax

9    implication against Intuit and Turbo Tax, he was fighting

10   against all these companies that makes the money off tax

11   software.  It was like 50 to 51 something vote in California

12   and all these companies had more money and more to lobby the

13   legislature there.  And they were going against one guy who

14   invested all of his money, I think it was $30,000, but still

15   it wasn't enough.  So it's got a lot of power to sway the

16   direction of a lot of things.

17        MR. SCHWALB:  Okay.  Anybody else raise their hand?

18   I think I got to everyone.  Thank you.  Thank you for telling

19   me about that.

20             Is there anyone who thinks that if there's a

21   defendant who is sued in a lawsuit and he's a wealthy person

22   or a deep pocket, that that person should be held responsible

23   simply because he or she might have the ability to pay the

24   award that's being asked for in the lawsuit?  Does anybody

25   feel that the ability to pay is something that should be

1    considered in deciding whether somebody should be held

2    responsible?  Yes, Juror 14.

3            VENIREPERSON NO. 14:  It depends on if the reason

4    was because they weren't in the first place, because I feel a

5    lot is that is the first place they are suing because they

6    are not given fair wages.

7            MR. SCHWALB:  Okay.  Anybody else have any thoughts

8    on whether simply having money or being wealthy is a reason

9    to be held responsible for something?

10           Who believes that if you invest in a business, if

11   you're a major investor in a business, you have an obligation

12   to make sure that you oversee all the affairs of the business

13   you invest in?  Anybody feel that way?  If you are hiring

14   somebody to do a job or investing in a company, it's not just

15   the person who you've hired to do the job's job to do it, but

16   the investor or owner have an obligation to oversee the

17   person you hired.  Anybody feel that way.  Yes, Juror No. 3.

18           VENIREPERSON NO. 3:  Yes, I think it's your own

19   money so you want to know what it's going for and make sure

20   it's invested wisely.  So, yes, I think it's yours, so you

21   have a say on it.

22           MR. SCHWALB:  Okay.  How about you, ma'am?  Juror

23   No. 4.  You raised your hand to that question.

24           VENIREPERSON NO. 4:  It's about being responsible.

25           THE COURT:  I can't hear you.

1          VENIREPERSON NO. 4:  I think it's about being

2   responsible to oversee that things are being done as was

3   agreed upon.

4          MR. SCHWALB:  Anybody else feel the same way?

5          VENIREPERSON NO. 23:  It just depends how it was

6   structured or set up initially.

7          MR. SCHWALB:  Juror 23, tell me a little bit about

8   what you mean by that.

9          VENIREPERSON NO. 23:  In terms of the investor and

10  the relationship, what was requested out of the investor.

11         MR. SCHWALB:  Okay.  Thank you.

12         VENIREPERSON NO. 21:  I think there's a difference

13  between investor and owner.

14         THE COURT:  Who is speaking now?  Wait.  21?

15         MR. SCHWALB:  Juror 21.

16         VENIREPERSON NO. 21:  The difference between the

17  investor and owner, the owner should know what's going on.

18         MR. SCHWALB:  Okay.  Anybody feel the same way?

19  Juror No. 16.

20         VENIREPERSON NO. 16:  I feel the same way as what

21  everyone said, you're investing, you should know a little bit

22  about what's going on.

23         MR. SCHWALB:  And Juror No. 12.

24         VENIREPERSON NO. 12:  I would say you should do your

25  due diligence.  If you're giving your money, you should know

1    what it's going toward.

2         MR. SCHWALB:  I want to follow up on a couple of

3    questions that I believe it was Juror 21 and 29 answered in

4    response to Mr. Simon's questions.  So, Juror 29, you

5    remember the questions about Governor Huckabee and whether or

6    not because you have followed him on TV and on the radio you

7    come in with a favorable impression about him.  I want to ask

8    you, if you heard all the evidence in this case and weighed

9    what was said, would you be able to keep an open mind and

10   judge after hearing all the evidence whether you believed

11   what Governor Huckabee might say in this trial

12   notwithstanding the fact that you come in with a favorable

13   opinion about him?

14        VENIREPERSON NO. 29:  If the evidence is there,

15   that's the way I would go.

16        MR. SCHWALB:  You would listen to the evidence and

17   make up your mind based on what you heard in the courtroom?

18        VENIREPERSON NO. 29:  Yes.

19        MR. SCHWALB:  And Juror 21, a similar question.  You

20   mentioned you have at least coming into trial a favorable

21   opinion.  Would you able to weigh Governor Huckabee's

22   credibility based on the evidence you hear in the courtroom?

23        VENIREPERSON NO. 21:  Absolutely.

24        MR. SCHWALB:  And any opinion you might have of him

25   favorable before trial would not affect whether you could be

1    a fair and impartial juror during the trial?  That's correct?

2          VENIREPERSON NO. 21:  Yes.

3          MR. SCHWALB:  Okay.  Thank you.  Is there anybody

4    who thinks -- let me ask it this way.  Some people do think

5    that a good way to stop companies who harm consumers is to

6    punish not just the company that harms the consumer but also

7    to punish the people who invest or who do business with the

8    companies.  It's sometimes referred to as a boycott theory,

9    you boycott the company and the people who do business with

10   the company and that's an effective way of getting companies

11   to stop harming consumers.  Does anybody feel that that's a

12   good way to stop companies who do harm to consumers is to

13   boycott or punish those who invest or do business with the

14   bad actors?  Do you understand my question?  Juror 16, what

15   do you think?

16         VENIREPERSON NO. 16:  I don't think so.  I don't

17   shop at certain places because I know it's causing more harm.

18   So I'm only the one that can make a difference as a consumer.

19   So I think -- yeah, I think that's the answer.

20         MR. SCHWALB:  No, there is no right or wrong answer,

21   it's just what people think about this issue.  There are lots

22   of different views on it.  Juror 14, what do you think?

23         VENIREPERSON NO. 14:  Really quickly, the same

24   thing, if a company is funneling money to another company and

25   I feel like the original company is at fault for something

1    then I wouldn't want to support the other company for

2    receiving money from this untrustworthy corporation.

3           MR. SCHWALB:  Okay.  Juror 11, do you have some

4    thoughts on this?

5           VENIREPERSON NO. 11:  Yes, if it's a lucrative

6    business and it needs to be stopped, I think stopping the

7    flow of money would be more effective than holding just the

8    management liable.

9           MR. SCHWALB:  Okay.

10          VENIREPERSON NO. 11:  And get new managers.

11          MR. SCHWALB:  Anybody else feel like a good way to

12   stop a company that is either harming or allegedly harming

13   consumers is to punish the people who are doing business with

14   that company or people who have invested in the company?

15   Juror 25?

16          VENIREPERSON NO. 25:  I have two minds here.  I do

17   boycott companies.  Do think it does any good?  No.

18          MR. SCHWALB:  Okay.  Juror 22.

19          VENIREPERSON NO. 22:  I'm thinking boycott and

20   punish are two different things to me.  I think boycott is

21   saying I'm not going to support this.  Punish is a direct

22   action against the person.  So I do believe in boycotting and

23   expressing your opinion that way.  I'm not for sure about

24   punishing.

25          MR. SCHWALB:  Okay.  Thank you.  That's a good

1   distinction.  Okay.  Last question.  Is there anyone who

2   believes that there's anything wrong or improper about a

3   wealthy person using his wealth to support and promote

4   religious or political causes?  Anybody have a problem with

5   somebody who uses his or her wealth to support religious or

6   political causes?  Juror 25.

7            VENIREPERSON NO. 25:  All I want is organized, not

8   just individual but an organized group of individuals.

9            MR. SCHWALB:  What do you mean that, an organized

10  group of individuals?

11           VENIREPERSON NO. 25:  They get together, they meet,

12  they all decide to use their wealth to manipulate the

13  political system or the law.

14           MR. SCHWALB:  Okay.  Anybody else feel that there is

15  something wrong?  Juror 13.

16           VENIREPERSON NO. 13:  If you force your --

17           THE COURT:  I can't hear you.

18           VENIREPERSON NO. 13:  Not if you force your

19  religious beliefs on that person with the act of money or

20  anything like that.  You know how there's a Christian,

21  there's Jewish, and you think, oh, why do you believe in

22  that, you should believe in this, you're not accountable or

23  you're not trustworthy just because your religion, you

24  shouldn't force religious beliefs on somebody else that don't

25  believe.

1              MR. SCHWALB:  So you have a problem if I hear you

2      saying if you use your money or wealth to try to change other

3      people's opinions or force your views, you have a problem

4      with that.  But do you have a problem if people use their

5      wealth to promote causes, political or religious, if they

6      feel strongly about it but aren't trying to change other

7      people's minds?

8              VENIREPERSON NO. 13:  Yeah, that's fine.

9              MR. SCHWALB:  Anybody else have any thoughts on that

10     topic that I haven't heard from?  Thank you all very much.

11             THE COURT:  Does that conclude the questioning by

12     counsel?

13             MR. SCHWALB:  Yes, Your Honor.

14             MR. SIMON:  Yes, Your Honor.

15             THE COURT:  Could I see counsel a moment at the

16     bench, please, just talking about a time issue.

17             (The following proceedings were held at the bench

18     and outside the hearing of open court:)

19             THE COURT:  We have really two things to discuss,

20     one is length of time you would like to have a break for

21     lunch, which I respect.  I don't want to keep you here and

22     then go right into the case after we do our work.  So you

23     will have time to have something for lunch.  So I'm thinking

24     it's going to take a substantial amount of time to go through

25     challenges for cause and to do the strikes.  It's going to

1  take more than an hour I think.  So I'm thinking maybe I'll

2  tell the jury about -- it's now 12:15.  I think I'm going to

3  have them come back at two o'clock, which is an hour and 45

4  minutes.  Will that be time for us to do our business and get

5  something to eat?  Okay.  When we leave here we're going to

6  excuse you for 30 minutes for lunch and then we'll come back.

7           (The following proceedings continued within the

8  hearing of open court:)

9           THE COURT:  We have a lot of work to do in your

10  absence.  Counsel will be on a short leash for a lunch break

11  and then we're going to reassemble here in your absence and

12  do the work that we have to do.  So I'm going to excuse you

13  until two o'clock, that's an hour and 45 minutes from now.

14           When you leave this room, please don't come back to

15  this area because attorneys may be taking matters up with the

16  Court and you may hear things that you're not supposed to

17  hear.  So please this time go back to the jury room, back

18  there, and then you'll be brought back here when it's time, a

19  few minutes before two o'clock.  So once you leave here and

20  have lunch, but please don't return to the courtroom until

21  you first go to the jury assembly room.

22           Until the case is given to you to decide, you must

23  not discuss the case with yourself, with others or remain in

24  the presence of anyone discussing it.  If anyone should try

25  to talk to you about the case, advise me immediately.  Do not

1    read, watch, or listen to any radio, television, or news

2    reports of the trial.  And keep an open mind until all the

3    evidence has been received and you've heard the views of your

4    fellow jurors.

5             Court is in recess until two o'clock.

6             VENIREPERSON NO. 23:  Are we calling the jury room

7    on the first floor?

8             THE COURT:  The jury room on the first floor,

9    correct.

10            VENIREPERSON NO. 23:  First floor?

11            THE COURT:  Yes.  Thank you.

12            (Jury panel dismissed from the courtroom.)

13            THE COURT:  All right.  I just wanted to alert

14   everyone so you can be thinking about challenges for cause.

15   Challenges for cause are unable to listen to the evidence and

16   unable to return a verdict based on the law.  If someone is

17   inclined to believe something or is behind the eight ball or

18   something like that, that's not going to be sufficient for me

19   to challenge someone for cause unless the totality of their

20   other answers suggest they should be stricken.  So I just

21   want you to be prepared when you come back for the challenges

22   for cause.

23            Court is in recess for 30 minutes.

24            (Court in recess at 12:14 p.m.)

25

1                    C E R T I F I C A T E

2           I, Susan R. Moran, Registered Merit Reporter, in

3    and for the United States District Court for the Eastern

4    District of Missouri, do hereby certify that I was present

5    at and reported in machine shorthand the proceedings in the

6    above-mentioned court; and that the foregoing transcript is

7    a true, correct, and complete transcript of my stenographic

8    notes.

9           I further certify that I am not attorney for, nor

10   employed by, nor related to any of the parties or attorneys

11   in this action, nor financially interested in the action.

12          I further certify that this transcript contains

13   pages 1 - 99 and that this reporter takes no responsibility

14   for missing or damaged pages of this transcript when same

15   transcript is copied by any party other than this reporter.

16          IN WITNESS WHEREOF, I have hereunto set my hand

17   at St. Louis, Missouri, this 7th day of August, 2017.

18

19                          _____

20                          /s/ Susan R. Moran
                            Registered Merit Reporter

21

22

23

24

25