# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| RON GOLAN and DORIT GOLAN, individually and on behalf of all other similarly situated, | Case No. 4:14-cv-0069-ERW |
| Plaintiffs, | Judge E. Richard Webber |
| v. | |
| VERITAS ENTERTAINMENT, LLC, *et al.*, | |
| Defendants. | |

**DEFENDANTS FREEEATS.COM, INC. AND AIC COMMUNICATIONS, LLC'S
POST-TRIAL MOTION FOR REDUCTION OF EXCESSIVE DAMAGES**

This Court previously held that all defendants, including ccAdvertising, preserved a defense, in the event of liability, to seek a reduction of the total damages award to comport with the Due Process Clause of the Fifth Amendment. (ECF No. 367 at 10-11) ("Defendants . . . are not precluded from raising this issue after trial . . . Damages under the TCPA . . . may be reduced as unconstitutionally excessive."). Having had liability determined against them, Defendants FreeEats.com, Inc. and AIC Communications, LLC (collectively "ccAdvertising") file this Motion to Reduce Excessive Damages in advance of the August 29, 2017, hearing.

## INTRODUCTION

The parties stipulated prior to trial that 3,242,493 telephone calls were made by ccAdvertising. (ECF No. 371 at ¶ 32). The TCPA sets the damages at $500 per call. *See* 27 U.S.C. § 227(b)(3)(B). Thus, ccAdvertising is currently liable for $1,621,246,500 in statutory damages alone even though Plaintiffs do not seek treble damages for knowing or intentional violations. For the reasons set forth in full below, the Due Process Clause and the federal courts

applying constitutional due process to TCPA damages awards support reducing the damages against ccAdvertising to no more than $324,249, although ccAdvertising submits that it cannot even afford that amount. *See Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 898, 900-01 (W.D. Tex. 2001) (reducing a $2.34 billion award to $465,375).

## ARGUMENT

### I. TCPA Statutory Damages Reduction Factors

The Due Process Clause limits the maximum amount of civil damages that can be awarded where that award is "grossly excessive or arbitrary." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) ("The Due Process Clause . . . prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor . . . To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property."); *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) ("An award that would be unconstitutionally excessive may be reduced."). Federal courts have frequently addressed a court's authority to reduce an award to comport with the Due Process Clause and these cases, particularly those applying the TCPA, provide guidance as to how to reduce damages in this case.

There are three cases in which liability was determined under the TCPA and the court subsequently reduced the total damages award. *Am. Blastfax, Inc.*, 164 F. Supp. 2d at 898, 900-01 (reducing a $2.34 billion award to $465,375); *Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 460, 466 (D. Md. 2012) (reducing a $10 million award to $1,000,000), *aff'd*, 729 F.3d 370 (4th Cir. 2013); *United States v. Dish Network LLC*, Case No. 3:09cv03073-SEM-TSH, 2017 U.S. Dist. LEXIS 85543, at *421 (C.D. Ill. June 5, 2017) (reducing an $8.1 billion award to $84 million).[1] These courts considered a variety of factors to determine by how much the damages

---

[1] Only one TCPA case has considered a reduction of damages and refused to do so; however, the award in that case was drastically smaller. *See Echevvaria v. Diversified Consultants, Inc.*, 2014 WL

2

award should be reduced. *See Id.* at *421 (because "[t]he TCPA does not list factors for reducing this amount," the court relied primarily on the factors set forth by the Federal Trade Commission as guidance: "the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require") (*quoting* 15 U.S.C. § 45(m)(1)(c)). *See also* ECF No. 367 ("A number of factors would be considered in determining if damages are excessive including Defendants' conduct and financial situation . . . ."). Though the reasoning varies, these courts' analyses can be boiled down to three main factors: (1) a defendant's culpability, (2) fairness, and (3) a defendant's ability to pay. These factors will be addressed in turn.

### A.   Factor #1: Culpability of a Defendant's Conduct

The first factor these courts considered was the relative culpability of the defendant's conduct in violating the TCPA. *See Murray*, 434 F.3d at 954 ("[A] judge may evaluate the defendant's overall conduct and control its total exposure."). In *Universal Elections*, the court observed that the purpose of the calls "was to suppress the votes of the largely African-American and Democratic populations in Baltimore City and Prince George's County"; the owner of Universal Elections instructed an employee "not to include an authority line" in the message, which was required under state campaign laws; he was then "indicted on four counts of election law violations" and "found guilty [of] conspiracy to distribute campaign material without the authority line required by Maryland state law"; and during his deposition, the company's owner "refused to answer any questions about his knowledge of the statute," which "corroborates" that he "undeniably had reason to know of and should have known about the TCPA disclosure

---

929275, at *12 (S.D.N.Y. Feb. 28, 2014) (the court recognized that where a defendant is "faced with a damages award of that magnitude [$2.34 billion in *Texas v. Am. Blastfax*], courts have been wary that the award may violate due process . . . and have adjusted them"; however, the award of $39,500 "was in an entirely different stratosphere than" the award in *Am. Blastfax* and did not "warrant such an adjustment").

requirements." 862 F. Supp. 2d at 461, 463-64, n.3, n.6. The court considered the defendants' actions, the fact that the violations were "willful and knowing," and that the State of Maryland brought this action to address "public harms" when reducing the award to $1 million. *Id.* at 464-65.

The court in *Dish Network* relied on the reasoning in *Universal Elections*, but also looked to the factors in the FTC Act to examine Dish's "degree of culpability [and] any history of prior such conduct." 2017 U.S. Dist. LEXIS 85543, at *402 (quoting 15 U.S.C. § 45(m)(1)(c)). The court concluded that Dish's "culpability [was] significant" based upon evidence that Dish "presented almost no competent evidence regarding how . . . calling lists were formulated"; "failed to properly determine whether Dish had . . . established businesses relationships with current and former customers"; and continued making calls for years after admittedly being "overwhelmed with consumer complaints," and where its own legal department viewed the campaign as "fraught with illegal and shady practices." *Id.* at *402-08.

### B. Factor #2: Fairness

The second factor these courts considered is whether the award is equitable or reasonable in light of all of the circumstances. In other words, even if a defendant's conduct was reprehensible, a court should take into consideration whether it caused little or no harm to the plaintiffs or public. *See, e.g., Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003) ("We acknowledge . . . [the] legitimate concern that the potential for a devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class, may raise due process issues."); *Freedman v. Advanced Wireless Cellular Commc'ns, Inc.*, No. SOM-L-611-02, 2005 WL 2122304, at *4 (N.J. Super. Ct. Law Div. June 24, 2005) (vacating a "manifestly unjust" $23 million award in TCPA damages by applying a catchall

state statute that allows reduction of damages in inequitable circumstances "when Congress intended damages of $500 to be pursued by individual plaintiffs").

In *Am. Blastfax*, the court summarily held that it would be "inequitable and unreasonable to award $500 for each of these violations" against "two individuals and a fifteen-employee company." 164 F. Supp. 2d at 900-01 & n.8. In *Universal Elections*, the court noted that despite being "ultimately unsuccessful . . . [the calls] damaged public faith in the democratic process that is at the core of our system of government." 862 F. Supp. 2d at 466-67. The court further explained that "[t]he sum is higher than the damages ultimately awarded in *American Blastfax*, but the difference is justified" because judgment was ten years prior and the "public costs of Universal Election's violations, though not calculable, are significantly greater." *Id.* at 466. Finally, in *Dish*, the "court considered an $8.1 billion award to be 'so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.'" 2017 U.S. Dist. LEXIS 85543, at *354-55 (*quoting St. Louis I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919)).

### C. Factor #3: Defendant's Ability to Pay

Finally, all three cases considered the defendants' presumptive ability to pay given the size of the company found liable. In *Maryland v. Universal Elections, Inc.*, the defendants "knowingly and willfully" made 69,497 calls, which trebled the potential award to over $100 million. 862 F. Supp. 2d at 461-62. The State of Maryland, however, requested one-tenth of that total award, or $10,424,550. *Id.* at 464-65. The district court held that a "$10 million penalty is disproportionate to the size of the company and the defendants' presumptive ability to pay." *Id.* at 466. In *Am. Blastfax,* the court also looked to the "size of the company" in determining whether the award was too large. *See* 164 F. Supp. 2d at 901 n.8 ("This would amount to an award of about $ 2.34 *billion* . . . against two individuals and a fifteen-employee company.") (emphasis in original).

In *Dish Network, LLC*, the record evidence established that Dish was worth $28 billion, made $1.4 billion in net income in 2016, and "had the ability to pay a significant percentage of its annual profits as a penalty." *Id.* at *409-10.  The court determined that an $8.1 billion award "would represent more than 25 percent of Dish's capital value and more than five years' net after tax profits," and therefore, "might put Dish out of business." *Id.*; *see also In re Toys R Us-Delaware, Inc Litig.*, 295 F.R.D. 438, 453–54 (C.D. Cal. 2014) ("[I]f Toys ultimately faces the prospect of class action damages that would end its existence as a company, the court [could] reduce those damages at a later stage of the proceedings if it [found] them unconstitutionally excessive.").  The court also considered the state governments' closing argument at the bench trial where the plaintiffs argued that any damages award less than $1 billion would satisfy the Due Process Clause.  *Dish*, 2017 U.S. Dist. LEXIS 85543, at *356 ("In light of Dish's ability to pay . . . the millions of violations, and the extended period over which the violations continued to occur [over five years], any damages award less than one billion dollars would not raise constitutional concerns.").  A $8.1 billion award, based upon millions of violations, was "wholly disproportionate to the offense and obviously unreasonable." *Id.*  Ultimately, the court reduced the award to $84 million for the over 16 million TCPA violations, which is almost one-hundredth of the total award.  *Id.* at *398, 424.

Other cases that did not reach this post-liability determination have considered an award in the "billions" or even "millions" to be presumptively excessive against a defendant. *See, e.g., Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 256 (N.D. Ill. 2014) (in certifying a TCPA class, the court found that "[s]hould a damages award prove to be unconstitutionally excessive, it may be reduced" where defendants argued that potential liability could be "ruinous" to the company and be in the "billions"); *Murray*, 434 F.3d at 953–54 (if a FCRA class action

6

would result in unconstitutionally excessive damages "in the billions of dollars," then the appropriate response would be for the trial judge to reduce the excessive award); *see also Pasco v. Protus IP Solutions, Inc.*, 826 F. Supp. 2d 825, 835 (D. Md. 2011) ("[A]n aggregate [TCPA] award . . . could easily reach into the millions, and could therefore violate due process.").

**II.     The Evidence of ccAdvertising's Violations Requires this Court to Significantly Reduce the Statutory Damages Award.**

The record shows that a $1.6 billion damages award against ccAdvertising is "obviously unreasonable" and "oppressive." *Dish Network*, 2017 U.S. Dist. LEXIS 85543, at *354. All three factors militate a reduction of the award.

**A.     ccAdvertising's Degree of Culpability Does Not Warrant Such An Excessive Award.**

The lack of reprehensibility of ccAdvertising's conduct, especially relative to the three cases described throughout this motion where Plaintiffs pursued knowing and intentional violations unlike the plaintiffs here, also demands a significant reduction. First, this case was <u>not</u> brought by any government seeking to fine or punish ccAdvertising for its conduct to society, but rather private litigants seeking a payday. Second, ccAdvertising's actions were <u>not</u> made "willfully or knowingly," which would require trebling of the damages award prior to reduction. *See* 47 U.S.C. § 227(b)(3), (g)(1). Indeed, Plaintiffs do not even seek damages for knowing or intentional violations.

To be sure, the record evidence demonstrates that ccAdvertising was attempting, in every way, to comply with the law. ccAdvertising does not seek to re-litigate liability in this motion, but for the purposes of damages, this Court should consider ccAdvertising's beliefs and conduct with respect to the calls in determining its relative culpability. Specifically, in 2012, the law as to telemarketing was uncertain, at best. In 2003, the FCC Order analyzed "dual purpose" calls, which were described as those calls that were made for both informational purposes and commercial

7

purposes. *See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14098 ¶ 142 (2003). Then, only six months before these calls were made in 2012, the FCC again mentioned these same kinds of "dual-purpose robocalls," and held that where a call is challenged as a TCPA violation "because the primary motivation" is an unsolicited advertisement, the alleged violations should be considered "on a case-by-case basis." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1843 ¶¶ 30-31 (2012). This 2012 order, however, did not discuss dual-purpose calls that included both a political purpose, which is exempt from liability, and a commercial purpose.

Without further guidance from the FCC or the courts, ccAdvertising believed its call campaign to be exempt from liability because the "primary motivation" was to make political research calls and gather more data for its Opt-In Channel. *See* Tr. T. 2A 53:15-18 (G. Joseph) ("[M]y intention with this campaign was to fertilize the polling arena at the beginning of the election season with issues and voices that would help influence the 2012 election."); *Id.* at 107:15-19 (the calls were "political in nature"). The evidence at trial revealed that the parties involved in this call campaign each had their own reasons for participating: Governor Huckabee wanted to promote his radio show, which was not a commercial purpose under the TCPA (Tr. T. 2A 55:20-21); Veritas Marketing Group, LLC paid for the calls to promote the movie (Joint Stipulation of Facts, ECF No. 371 at ¶ 4); and ccAdvertising used Veritas Marketing Group's sponsorship to fund this campaign to gather respondent data and build future relationships (*Id.* at 56:9-10 ("My agenda for this call was a lot different than" promoting the movie). To be sure, ccAdvertising had no monetary incentive for the movie to succeed, such as a bonus if the movie made money, and, despite the fact that it was an unequivocal failure, ccAdvertising was paid all the same as it continued to gather data for its own benefit. *See* Tr. T. 2A 26:25-27:4 ("If Last Ounce of Courage

was part [of] it that's fine, but the email that you showed me before, sir [P-1-597] detailed a six-point plan that I had for the 2012 elections and how Last Ounce of Courage may fit into that if it was done appropriately."). Even Plaintiffs' counsel, who argued to this Court that the only purpose of the calls was telemarketing, suggested to the jury in his closing argument that the (now disproven) agency relationship was premised on a larger goal: "It was more than just advertising this movie. Okay? **It was to influence and affect the 2012 presidential campaign**." *See* Plaintiffs' Closing Argument, Tr. T. Vol. 7 43:16-18 (emphasis added).

Under the TCPA, if a call is political, no prior express consent is required. *See* 47 U.S.C. § 227(b)(2)(B)(i). Thus, ccAdvertising believed that because its calls were "political survey calls," consent was not required. But, even if they were not, the calls were made to previously opted-in consumers who wished to hear about "religious liberty." *See* Tr. T. 4A 27:14-20 (S. Griffin). Nevertheless, to be cautious, ccAdvertising chose to add an additional opt-in question before playing the detailed promotional message mentioning the movie *Last Ounce of Courage* (the only part of the call that could be considered an "advertisement") in an attempt to comply with the law as it understood it and to ensure the primary motivation was the political research survey. *See* Tr. T. 2A 116:11-118:9 ("[O]nce you get the opt-in per the FCC rules at the time, you could communicate with people a lot."); *id.* at 106:20-22 ("So we were creating an Opt-In Channel of landlines and mobile phones **anticipating a change in the landscape** that [ultimately] happened in October 2013.") (emphasis added).

This Court should consider that ccAdvertising attempted to comply with the governing laws and regulations at the time. This Court should also take into account that its campaign did not harass callers to go see this movie – it required a homeowner to voluntarily and affirmatively say "Yes" and only the word "Yes" to hear details about the movie. Compared to the defendants

9

in *Universal Elections* whose sole purpose "was to suppress the votes" of communities, ccAdvertising's purpose was to actually obtain permission from more voters to build its "Opt-In Channel" before the 2012 Presidential Election in November. *Id.* at 166:11-23 ("ccAdvertising's goal" was "to develop an Opt-In Channel universe" for the 2012 presidential election). *Compare* Tr. T. 4A 25:8-24 (S. Griffin) ("[Joseph] said if a consumer had opted-in, and he used the examples of the permission base of saying "Yes" to the opt-in question, that that meant that they had given their approval in that particular campaign . . . and so he said opting-in was required to comply within the law.") *and Id.* at 26:5-11 ("[Joseph] felt the movie would be a perfect partner to sponsor the robocalls in question here because the film dealt with religious liberty. Religious liberty was something he wanted to do political research on, and we would plug in great with the opt-in if the consumer wanted and gave their permission to hear about the movie, yes, sir.") *with Dish Network,* 2017 U.S. Dist. LEXIS 85543, at *408 (Dish's legal department viewed the campaigns as "fraught with illegal and shady practices") *and Universal Elections*, 862 F. Supp. 2d at 463 (defendants were criminally convicted for an active decision "not to include the required identifying information in the message" despite being "aware of the relevant TCPA requirement months, if not years, before the relevant decisions in this case") *and Am. Blastfax*, 164 F. Supp. 2d at 894 (defendants violated other laws "by misleading Texas consumers about the legality of its business").

As part of the culpability analysis, this Court should also consider that, unlike the defendants in the other cases which have had awards reduced against them, ccAdvertising had no "history of prior such conduct." *Dish,* 2017 U.S. Dist. LEXIS 85543, at *402. In fact, where the defendants in *Dish* and *American Blastfax* were held liable for calls (or faxes) made over a series of campaigns, the evidence in this case demonstrates that prior to this single campaign,

ccAdvertising had conducted "thousands" of other campaigns that had not violated the TCPA. *See* Tr. T. 2A 106:23-107:1.  To be sure, ccAdvertising was conducting "hundreds of campaigns at the time [in 2012 because] it was election season." *Id.* at 105:17-18.

By way of comparison, in *Am. Blastfax*, "defendants had a general policy not to inform customers about the TCPA." *See* 164 F. Supp. 2d at 901-02.  Here, Mr. Joseph and ccAdvertising made sure its clients understood both why opt-in questions were required and how that complied with the TCPA in its view at the time. Gov. Mike Huckabee, who frequently worked with ccAdvertising, "had a number of discussions with Gabe Joseph about the legality" and was "assured" that ccAdvertising had "vigorously defended the right to make these calls, had been challenged on other occasions, had successfully fought back the challenges, and had won." *See* Tr. T. 5A 81:23-82:5 (offer of proof).  Veritas Marketing Group's president, Steve Griffin, understood that "these calls were to be political survey calls" based on Mr. Joseph's statements that the "religious liberty theme" of the movie fit into the consent of the calls, and ccAdvertising "was using [a list of people who] had been opted in, which meant that he could call them back on different messages." *See* Tr. T. 3B 122:15:18 (offer of proof); Tr. T. 4A 26:5-11.

ccAdvertising's conduct leading up to the calls evidences its goal to comply with the law. It was neither reckless nor deliberate – it just simply got it wrong at a time of uncertainty in the law.  These calls were not made to annoy or solicit homeowners or for any other malicious reason. *Contra Universal Elections*, 862 F. Supp. 2d at 461-623, n.3; *Am. Blastfax*, 164 F. Supp. 2d at 895 (defendants "continued to send unsolicited . . . fax advertisements" even after it "realized the TCPA's heavy fines could bankrupt Blastfax" and even sent a fax advertisement "to the Texas Attorney general's office").  This was not a series of calls that lasted months or even years, rather it lasted less than one week.  *Compare* ECF No. 371 at ¶ 30 *with Blastfax,* 164 F. Supp. 2d at n.8

11

(5 months) *and Dish Network*, 2017 U.S. Dist. LEXIS 85543, at *356 (5 years).  ccAdvertising's limited culpability demands a significant reduction of the damages awarded against it.

**B.      It Is "Inequitable and Unreasonable" To Award a $1.6 Billion Award.**

In considering whether the equities demand a reduction of the award against ccAdvertising, the Court must look to the totality of the circumstances, including measuring ccAdvertising's conduct relative to the limited harm it caused the plaintiffs.

1.      The Class Representatives Were Not Harmed and Many Class Members Did Not Even Hear the Telemarketing Purpose of the Call.

The calls in this case did not reach a level of pervasiveness in which the government sought to punish ccAdvertising for any harm against the public. *Contra Universal Elections*, 862 F. Supp. 2d at 466-67 (the calls "damaged public faith in the democratic process").  Rather, two private litigants who received two, 11-second voicemails while they were not home brought this suit. *See* Def. Ex. 101 (audio of voicemails); Tr. T. Vol. 6 at 152:12-153:14.  Neither voicemail actually conveyed any information about the movie *Last Ounce of Courage*. *Id.* at 155:8-13.  Furthermore, one of the two class representatives, Dorit Golan (who was not a witness at trial), testified at her deposition that they were not "harmed" at all—emotionally financially, or otherwise—by the two calls. *See* D. Golan Depo. at 15:18-22 (attached hereto as Exhibit A).

For the purposes of damages, this Court should consider just how many class members actually heard any mention of the movie.  Of the roughly 3.2 million landlines that received a call, only 234,208 actually heard any mention of the movie. *See* Def. Ex. 86 at 12-13.  Of those 234,208, over half (132,449) said "Yes" and only the word "Yes" to hear more about the movie. *See Id.*  The Court should consider once more Plaintiffs' closing statement to the jury in this case, where Plaintiffs argued that the calls were "more" than telemarketing, and were, in fact, "to influence and affect the 2012 presidential campaign." *See* Plaintiffs' Closing Argument, Tr. T. Vol. 7 43:16-

18. If that is true and Plaintiffs are correct, of the 3,242,493 calls made, 3,008,285 did not actually hear the telemarketing aspect of the call because it never mentioned *Last Ounce of Courage*. Consequently, almost all class members were not harmed in any tangible way by these violations. Thus, the equities and circumstances of this case demand a substantially greater reduction than in past cases.

### 2. $1.6 Billion Is Unreasonable in Comparison to Other Awards.

The Court should also consider the magnitude of a $1.6 billion statutory award in light of other awards for much more egregious conduct than calls left on a plaintiff's answering machine. For example, in a string of 2016 personal injury lawsuits against Johnson & Johnson Co. alleging that its talcum powder was linked to ovarian cancer, three St. Louis juries awarded $72 million, $55 million, and $70 million, respectively, to women, one now deceased, who had or currently have ovarian cancer. *See* Talcum Powder Cancer Center, *available at* http://www.talcumpowder-cancer.com/trials/fox-vs-johnson-and-johnson/. Even the sum of these three awards combined, which amounts to just under $200 million, is a mere fraction of the award against ccAdvertising for making phone calls before any reduction.

None of the three cases awarded damages greater than $9 per call. In *Am. Blastfax*, the court reduced the award to $465,375 for 4,687,500 violations, which amounts to just under $0.10 per fax. Based on the analysis of the three factors above and comparing the facts in *Am. Blastfax* to those here, the reduction in damages should be no more than the reduction applied in *Am. Blastfax* given ccAdvertising's inability to pay, lack of reprehensible conduct, and plaintiffs' absence of injury. As such, the award against ccAdvertising, at most, should be no more than $0.10 per call for 3,242,493 calls, or $324,249.

13

### C.  ccAdvertising Does Not Have the Ability to Pay an Award of This Size.

The small size of ccAdvertising plays an important factor in reducing the award against it. *See Universal Elections*, 862 F. Supp. 2d at 466 ("[A] $10 million penalty is disproportionate to the size of the company and the defendants' presumptive ability to pay."); *Blastfax, Inc.*, 164 F. Supp. 2d at 900 (a $2.34 billion award was inequitable against a "fifteen-employee company"). The "fifteen-employee company" in *Am. Blastfax* had its award reduced to less than a half-million dollars, despite committing knowing and willful violations and sharing the award jointly and severally among its two owners as well. *See id.* at 900. Similarly, in *Dish Network*, the court considered that even an award that accounted for more than "25 percent of Dish's capital value" was "wholly disproportionate." *Dish Network, LLC*, 2017 U.S. Dist. LEXIS 85543, at *409-10. Dish, however, could easily pay an $84 million award given the evidence that it has over $1 billion annually in net income and over $5 billion in cash. *See id.* at *240-41.

The size and financial resources of ccAdvertising are much more akin to the defendants in *Am. Blastfax* and *Universal Elections* than that of *Dish.* The evidence at trial established that ccAdvertising had less than fifteen employees in 2012—it had eleven employees. *See* Tr. T 2A 105:11-13. Currently, it has none. *See* Aug. 28, 2017 Declaration of Gabriel Joseph ¶ 5 (attached hereto as Exhibit B). Since 2015, ccAdvertising has been in the process of dissolving. *See* Tr. T 2A at 105:1-2; *see also* Exhibit B ¶¶ 3, 10. ccAdvertising has no significant assets and is no longer operational. *Id.* at ¶¶ 3-9. For these reasons, this factor requires a significant reduction of the award against ccAdvertising.

### **CONCLUSION**

WHEREFORE, ccAdvertising respectfully requests that the Court enter an order reducing judgment against ccAdvertising that imposes a judgment of no more than $324,249.

Dated: August 28, 2017					Respectfully submitted,


							/s/ *Teresa M. Young*
							Teresa M. Young #52427
							BROWN & JAMES, P.C.
							800 Market Street, 11th Floor
							St. Louis, Missouri 63101
							(314) 421-3400
							(314) 421-3128 Facsimile
							tyoung@bjpc.com

							*Attorney for Defendants FreeEats.com, AIC Communications, LLC, and Gabriel S. Joseph, III*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 28th day of August, 2017, electronically filed DEFENDANTS FREEATS.COM, INC. AND AIC COMMUNICATIONS, LLC'S POST-TRIAL MOTION TO REDUCE EXCESIVE DAMAGES and all exhibits to same with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to all counsel of record and other CM/ECF participants.

							/s/ *Teresa M. Young*
							Teresa M. Young

#13835536